Versión para imprimir


EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Yiyi Motors, Inc.<br><br>     Peticionario<br><br>        v.<br><br>Estado Libre Asociado de<br>Puerto Rico, Secretario de<br>Hacienda y Secretario de<br>Transportación y Obras Públicas<br><br>     Recurridos | Certiorari<br><br>2009 TSPR 159<br><br>177 DPR \_\_\_\_ |

Número del Caso: CC-2004-675

Fecha: 14 de octubre de 2009

Tribunal de Apelaciones:

        Región Judicial de  San Juan

Juez Ponente:

        Hon. Dora T. Peñagarícano Soler

Abogados de la Parte Peticionaria:

        Lcdo. Hirmám Martínez López
        Lcdo. Fernando e. Agrait Betancourt
        Lcdo. Orlando H. Martínez Echevarría

Oficina del Procurador General:

        Lcda. Carmen A. Riera Cintrón
        Procuradora General Auxiliar

Materia: Injuction

Este documento constituye un documento oficial del   Tribunal Supremo que está sujeto a los cambios y correcciones del proces  o de compilación y publicación oficial de las decisiones del Tribunal.   Su distribución electrónica se hace como un servicio público a la c   omunidad. ?
?

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Yiyi Motors, Inc.

   Peticionario

        v.

                     CC-2004-675     Certiorari

Estado Libre Asociado de
Puerto Rico, Secretario de
Hacienda y Secretario de
Transportación y Obras
Públicas

   Recurridos

Opinión del Tribunal emitida por el Juez Asociado señor Kolthoff Caraballo

San Juan, Puerto Rico, a 14 de octubre de 2009.

"Sabemos que al aplicar el derecho público —y el derecho fiscal es parte del derecho público— hay que tener en mente el interés general, pero **parte de ese interés general es hacerle justicia a los ciudadanos. Si no, ¿para qué existen los tribunales y el gobierno en general? La función del gobierno obviamente va más allá de barrer las calles y operar el servicio de la policía. Incluye en grado apreciable el hacer justicia.**"[1]

Reconocida la potestad que tiene el Secretario de Hacienda de imponer y cobrar arbitrios sobre los vehículos de motor que se importan a Puerto Rico, nos corresponde determinar si este funcionario tiene la facultad de cobrar arbitrios por la diferencia

---

[1] _Talcott Inter-Amer. Corp. v. Registrador_, 104 D.P.R. 254, 262-263 (1975) (énfasis suplido).

que surge entre el "precio sugerido de venta al consumidor" —declarado por el importador al momento del embarque— y el precio en que el concesionario finalmente lo vende. De concluir que constituye una imposición de arbitrios no autorizada por ley, debemos examinar si el remedio extraordinario de *injunction* está disponible para impugnar la actuación del Secretario de Hacienda de negarse a emitir una certificación de pago de arbitrios válida —necesaria para inscribir el vehículo en el Departamento de Transportación y Obras Públicas— hasta que se satisfaga el tributo impuesto ilegalmente.

**I**

El 27 de mayo de 2003 Yiyi Motors, Inc. (Yiyi Motors) presentó en el Tribunal de Primera Instancia una demanda de *injunction* en contra del Estado Libre Asociado de Puerto Rico, el Secretario de Hacienda y el Secretario de Transportación y Obras Públicas. Expuso que es un concesionario que adquiere los vehículos de motor marca Nissan de Motorambar, Inc. (Motorambar), y que es éste el importador o el consignatario de dichos vehículos en Puerto Rico. En este sentido, adujo que cuando Motorambar le vende el inventario de vehículos, ya éste ha declarado y satisfecho los arbitrios sobre los vehículos a base del "precio sugerido de venta", según lo establece el Código de Rentas Internas.[2] Asimismo, en vista de que es un concesionario no importador de vehículos, arguyó que

_____

[2] Sec. 2011 del Código de Rentas Internas, Ley Núm. 120 de 31 de octubre de 1994, según enmendada, 13 L.P.R.A. sec. 9014.

únicamente es responsable de presentar en el Departamento de Transportación y Obras Públicas (DTOP) los documentos de la venta al consumidor y la certificación de pago de arbitrios que emita el Departamento de Hacienda como evidencia del pago de los arbitrios realizado por Motorambar, ambos documentos, requeridos por el DTOP para la inscripción en el registro de vehículos.

Ahora bien, Yiyi Motors sostuvo que desde noviembre de 2002 el Departamento de Hacienda adoptó un procedimiento de tributación para los vehículos de motor que altera ilegalmente el establecido estatutariamente. El procedimiento al que se refiere el peticionario es el del cobro de los impuestos y la consiguiente expedición de la certificación de pago de arbitrios.

En cuanto al cobro del tributo, Yiyi Motors alegó que la ilegalidad del procedimiento radica en que el Departamento de Hacienda le exige a los concesionarios que informen el precio en que se produjo la venta del vehículo al consumidor, y si éste excede del precio sugerido de venta declarado por el importador al embarque del vehículo, le requiere al concesionario que pague arbitrios por la diferencia resultante. Por tanto, respecto a la expedición de la certificación de pago de arbitrios, reveló que a pesar de que el importador pague los arbitrios a base del precio sugerido de venta —conforme lo establece la ley— y se proceda con el embarque del vehículo, el Secretario de Hacienda emite la aludida certificación con una expresión que limita de su faz la

validez de ésta, esto es, en la parte inferior del documento se señala: "ESTA CERTIFICACI[Ó]N NO ES V[Á]LIDA PARA REGISTRAR EL VEH[Í]CULO EN EL DEPARTAMENTO DE TRANSPORTACI[Ó]N Y OBRAS P[Ú]BLICAS".

Como consecuencia de lo anterior, señala el peticionario que la única opción que tiene para eliminar esta restricción es tributar por la diferencia resultante entre el precio sugerido de venta y el precio final de venta —cuando éste sea mayor—, lo que constituye el establecimiento de una base contributiva distinta a la dispuesta en el Código de Rentas Internas y, por consiguiente, la imposición ilegal de un arbitrio. Además, advirtió que en la medida en que el Secretario de Hacienda le impone a él como concesionario pagar la "deficiencia contributiva" resultante —sin lo cual no expide una certificación de pago válida—, dicho proceder constituye una actuación ilegal y *ultra vires* por parte de este funcionario, toda vez que el Código de Rentas Internas dispone expresamente que en los casos de artículos importados que estén gravados con el pago de arbitrios, "la persona responsable del pago de los impuestos o contribuyente lo será ... [e]l consignatario, si el artículo viene consignado directamente a un consignatario".[3]

En virtud de lo anterior, Yiyi Motors solicitó, entre otras cosas, que se le ordenara al Secretario de Hacienda

---

[3] Sec. 2051(a)(1) del Código de Rentas Internas, *supra*, 13 L.P.R.A. sec. 9068(a)(1).

que desistiera de sustituir ilegalmente la base fiscal establecida en el Código de Rentas Internas —el "precio sugerido de venta al consumidor"— para el cálculo de los arbitrios que el importador tiene que pagar al embarque de los vehículos de motor. Además, peticionó que se le ordenara a este funcionario que cesara de cobrar dichos impuestos a él como concesionario, en lugar de al importador o consignatario según dispone el propio Código de Rentas Internas.

De esta forma, fundamentó la procedencia del *injunction* en que era el mecanismo adecuado para obligar al Secretario de Hacienda a hacer cumplir las disposiciones estatutarias en torno a la tributación de los vehículos de motor, y así garantizar el ejercicio y la continuidad de sus operaciones comerciales. En cuanto a esto último, el peticionario adujo que las actuaciones ilegales de este funcionario le han causado un daño irreparable toda vez que, entre otras cosas, le impide inscribir en el registro del DTOP los vehículos ya vendidos y entregarle a sus clientes el correspondiente título.[4] En fin, sostuvo que para impedir dichos daños y defender sus derechos de la alteración ilegal de la estructura contributiva por parte del Secretario de Hacienda, no existe remedio alguno en ley que lo proteja de forma adecuada.

---

[4] Para el 27 de mayo de 2003, día en que presentó la demanda de *injunction* y un Memorando en apoyo a solicitud de *injunction*, Yiyi Motors alegó tener pendiente de inscribir 300 vehículos ya vendidos y cuentas por cobrar de instituciones financieras por la cantidad de $2,000,000.00.

Frente a las alegaciones y argumentaciones del peticionario, compareció el ELA mediante Moción en solicitud de desestimación y/o sentencia sumaria. Afirmó que las actuaciones del Secretario de Hacienda eran válidas por ser conforme a derecho, y que no se cumplía con los requisitos para la expedición del recurso extraordinario de *injunction* toda vez que los daños alegados se reducen a un asunto de naturaleza económica susceptible de ser compensado, por lo que no constituye el daño irreparable requerido para que proceda el *injunction*.

En cuanto a las actuaciones del Secretario de Hacienda, el Estado señaló que éstas eran válidas puesto que para establecer cuál es el "precio sugerido de venta al consumidor" de cada vehículo, el Código de Rentas Internas dispone que se tiene que incluir el margen de ganancia para la venta. De esta forma, el recurrido argumentó que a propósito de considerar el margen de ganancia para la venta, es necesario conocer el precio en que se vende el vehículo. Sostuvo que es precisamente por ello que la exposición de motivos de la Ley Núm. 80 de 17 de octubre de 1992 —mediante la cual se introdujo la base contributiva del precio sugerido de venta—, anunció que el precio sugerido de venta lo establece directamente el importador, pero "en mutuo acuerdo con el concesionario".

Además, el ELA adujo que en virtud de la facultad delegada al Secretario de Hacienda para establecer mediante reglamento las normas necesarias para la aplicación de la Ley Núm. 80, *supra*, el Departamento de

Hacienda adoptó el Reglamento para la Implantación de la Ley Núm. 80 de 17 de octubre de 1992, Reglamento 5020. Indicó que en éste se dispuso que en caso de que se vendiera un vehículo en exceso del precio sugerido de venta al consumidor, ello se tiene que evidenciar ante la agencia para determinar si el incremento está sujeto al pago de arbitrios adicionales por haber aumentado el margen de ganancia. De esta forma, manifestó que, en vista de que constituye una disposición reglamentaria que complementa la Ley Núm. 80, *supra*, está instituido el que la declaración de la venta y el pago por la diferencia en arbitrios es un requisito previo para la otorgación de una certificación de pago de arbitrios válida para la inscripción en el DTOP.

No obstante, aclaró que su contención es que cuando se vende un vehículo a un precio mayor que el sugerido para la venta según reportado por el importador al embarque, es éste quien viene obligado a solicitarle a la agencia el cambio para efectos del pago de arbitrios. Expresó que para que el importador pueda cumplir con esa obligación, es necesario que el concesionario le informe que la venta al detal del vehículo se va a efectuar por un precio mayor que el reportado como el "precio sugerido de venta al consumidor". Ahora bien, reveló que es sólo cuando el concesionario incumple su obligación de informar al importador el cambio en el precio sugerido de venta, que recae sobre él la obligación de declarar la diferencia y efectuar el pago.

En fin, el Estado alegó que este requerimiento por parte del Secretario de Hacienda no constituye la imposición de un nuevo arbitrio ni una alteración a la base fiscal sobre la cual éstos se calculan, sino que lo que ha hecho es establecer un mecanismo para compeler al cumplimiento de las disposiciones legales vigentes.

Por su parte, Yiyi Motors se opuso a la Moción en solicitud de desestimación y/o sentencia sumaria presentada por el ELA. En síntesis, reiteró sus planteamientos en cuanto a que la actuación del Secretario de Hacienda resulta en una imposición ilegal de arbitrios e impone el pago de éstos al concesionario, y no al consignatario, conforme lo establece el Código de Rentas Internas. Señaló que existen discrepancias entre la Ley Núm. 80, *supra*, y el Reglamento 5020 que redundan en actuaciones para las cuales el Secretario de Hacienda no tiene autoridad. Ilustró lo anterior haciendo alusión a la exposición de motivos de la Ley Núm. 80, *supra*, de la cual se desprende que la Asamblea Legislativa procuró que al momento de determinar el precio sugerido de venta de un vehículo, no hubiese intervención alguna por parte del Estado. Sobre el particular, advirtió que la ley sí le concede al Secretario de Hacienda la facultad para alterar el precio sugerido de venta y cobrar esa diferencia únicamente al importador, pero tiene que realizarlo previo al embarque del vehículo y en casos particulares, no de forma generalizada; además de que tiene que fundamentarlo

en una fuente de información debidamente reconocida en la industria automotriz de los Estados Unidos de América.

Trabadas las alegaciones de las partes, el Tribunal de Primera Instancia dictó sentencia y declaró sin lugar la demanda de *injunction* presentada por Yiyi Motors. Dictaminó que el Secretario de Hacienda no alteró la base contributiva para el cómputo de los arbitrios, por lo que no había usurpado las facultades o las prerrogativas de la Asamblea Legislativa al exigir el pago por la diferencia tributaria que surge cuando un concesionario vende un vehículo a un precio mayor al precio sugerido de venta. Dispuso que ello no podía entenderse como una contribución adicional, sino como una deficiencia contributiva. Ahora bien, concluyó que a Yiyi Motors le asistía la razón en cuanto a que el Secretario de Hacienda no tiene la facultad para imponerle el pago de dicha deficiencia, toda vez que el Código de Rentas Internas dispone que el pago le corresponde realizarlo al consignatario.

Respecto a la negativa del Secretario de Hacienda de emitir una certificación de pago de arbitrios válida, el foro primario determinó que este funcionario tiene la facultad en ley para requerir la presentación de la declaración de venta o cualquier otro documento demostrativo de ésta, y una declaración de arbitrios enmendada, si el precio en que se vendió el vehículo es distinto al precio sugerido de venta al consumidor originalmente reportado por el importador. De esta forma, el tribunal resolvió que el Secretario de Hacienda puede

abstenerse de emitir una certificación de pago de arbitrios válida hasta que determine que tras la venta del vehículo no surge ninguna deficiencia contributiva.

Así el dictamen judicial, tanto Yiyi Motors como el Estado presentaron mociones de reconsideración. El foro primario denegó ambas, no obstante, al declarar sin lugar la solicitud del ELA hizo constar la siguiente expresión:

> El tribunal entiende que el Secretario de Hacienda tiene la facultad en ley para requerir a los traficantes de vehículos que informen cualquier cambio en el precio sugerido de venta. Lo que este funcionario no puede hacer es imponerle el pago de la contribución al traficante por estar en conflicto con la sec. 2068 (a)(L) del Código de Rentas Internas de 1994, 13 L.P.R.A. sec. 9068 (a)(1).

Debido a que el Estado no recurrió de este dictamen, el hecho de que el contribuyente en el caso de autos lo es Motorambar y no Yiyi Motors, es un asunto que no está ahora ante nuestra consideración.

Ahora bien, Yiyi Motors presentó un recurso de apelación ante el Tribunal de Apelaciones mediante el cual alegó que incidió el foro primario al resolver que el Secretario de Hacienda tenía la facultad para impedir la inscripción de los vehículos —mediante la emisión de una certificación de pago de arbitrios limitada— cuando el precio en que se venda un vehículo resulta ser mayor que el declarado por el importador como el sugerido para la venta. Más aún, adujo que erró el referido tribunal al concluir que la diferencia que surge entre el precio sugerido de venta y el precio en que finalmente se vende el vehículo puede dar origen a una deficiencia

contributiva. Por último, solicitó que se revocase la determinación del Tribunal de Primera Instancia de denegar la procedencia del remedio extraordinario de *injunction*.

Luego de que el Procurador General expuso su posición respecto a los méritos del recurso de apelación presentado por Yiyi Motors, el Tribunal de Apelaciones dictó sentencia mediante la cual confirmó el dictamen del foro primario. Decretó que el Secretario de Hacienda está facultado para exigir los documentos que acrediten la venta del vehículo, con el objetivo de que se solventen los arbitrios aplicables tras la venta, por lo que puede abstenerse de emitir una certificación de pago válida cuando entienda que no se ha satisfecho la totalidad del tributo. De esta forma, concluyó que la actuación de este funcionario no constituye una imposición ilegal de un arbitrio, sino que lo que "persigue [es] velar por el pago pertinente de arbitrios sobre los vehículos en beneficio del fisco".

Por otro lado, el foro apelativo intermedio encontró adecuado aclarar que el término que define con mayor certeza la discrepancia entre los precios y los arbitrios pagados lo es el de "insuficiencia de arbitrios", toda vez que el concepto de "deficiencia contributiva" preceptúa un procedimiento distinto que atiende circunstancias particularmente disímiles a las que presenta el caso de autos. En este sentido, dictaminó que el Tribunal de Primera Instancia adjudicó correctamente al determinar que se debe tributar por la diferencia que se genera cuando un

vehículo se vende a un precio que excede el sugerido para la venta, pues ello acarrea que no se satisfaga la totalidad de los arbitrios correspondientes, lo que constituye una insuficiencia en el cobro de éstos. Por último, sostuvo la determinación apelada en cuanto a que procedía declarar sin lugar el *injunction* en vista de que los daños alegados son de naturaleza económica y, como tal, son resarcibles y no irreparables.

Inconforme con la sentencia dictada por el Tribunal de Apelaciones, Yiyi Motors acudió ante nos mediante una petición de *certiorari*. Señaló que el foro apelativo intermedio erró al no revocar al Tribunal de Primera Instancia toda vez que su sentencia permite que el Secretario de Hacienda: sustituya la base fiscal establecida en el Código de Rentas Internas para cobrar arbitrios a los vehículos importados; requiera sumariamente el pago de contribuciones adicionales fundamentadas en una base contributiva alterna; e impida inscribir los vehículos en el DTOP hasta que no se satisfaga el tributo adicional que surge cuando éstos se vendan por encima del precio sugerido.

El 5 de noviembre de 2004 declaramos sin lugar la petición de *certiorari*. No obstante, el 10 de diciembre del mismo año reconsideramos y expedimos el auto solicitado. Con el beneficio de la comparecencia de ambas partes, procedemos a resolver.[5]

---

[5] En esta etapa apelativa, Motorambar nos solicita intervención en calidad de amigo de la corte, no obstante,

**II**

**A**

Conforme a nuestro ordenamiento jurídico, la ley es el medio o fuente legal que establece los límites del poder y de las facultades de las agencias administrativas.[6] En vista de ello, hemos precisado que **"ni** la necesidad, **ni** la utilidad, **ni** la conveniencia pueden sustituir al estatuto en cuanto a fuente de poder de una agencia administrativa. **Es por ello que cualquier duda en cuanto a la existencia de dicho poder debe resolverse en contra de su ejercicio"**.[7]

Cuando la Asamblea Legislativa delega afirmativamente determinada función a una agencia, en el ejercicio de ésta, el ente administrativo no puede excederse de los límites establecidos expresa o implícitamente en el estatuto o por clara implicación de éste;[8] tampoco puede la Rama Judicial expandir el ámbito de acción que el legislador quiso establecer. Por el contrario, si la actuación de la agencia administrativa excede los poderes delegados por la Rama Legislativa, los tribunales deberán

---

por este medio, la declaramos sin lugar ya que no aduce nada que Yiyi Motors no haya argumentado en su comparecencia.

[6] Amieiro González v. Pinnacle Real Estate, 173 D.P.R. ___ (2008), 2008 T.S.P.R. 52, 2008 J.T.S. 73, 983; Caribe Comms., Inc. v. P.R.T.Co., 157 D.P.R. 203, 211 (2002).

[7] Raimundi v. Productora, 162 D.P.R. 215, 225 (2004) (énfasis en el original).

[8] Véase, Caribe Comms., Inc. v. P.R.T.Co., *supra*, pág. 213.

declararla *ultra vires* y, por ende, nula.[9] Así pues, cualquier interpretación judicial que avale la transgresión del ámbito del poder delegado a una agencia, implicaría la usurpación por la Rama Judicial de las prerrogativas de la Asamblea Legislativa, lo que tendría el efecto de soslayar los más elementales principios de hermenéutica.[10]

En ocasiones, las agencias transgreden el poder delegado mediante la aprobación de reglamentos que, en vez de implementar la política pública de una ley, la contravienen. Por ello, en nuestra función revisora de reglamentos administrativos, debemos hacer valer el principio elemental de que cuando la legislatura delega en una agencia el poder para promulgar reglamentos, éstos, para ser válidos, no pueden estar en conflicto con las normas establecidas en la propia ley.[11] De esta forma, un reglamento promulgado para implementar la ejecución de una ley, puede complementarla, pero no puede estar en conflicto con ésta, pues ello conlleva la sustitución del criterio del legislador por el de la agencia autorizada a

---

[9] Amieiro González v. Pinnacle Real Estate, *supra*, pág. 983; Caribe Comms., Inc. v. P.R.T.Co., *supra*, págs. 213-214. Acevedo v. Mun. de Aguadilla, 153 D.P.R. 788, 810 (2001); Misión Ind. P.R. v. J.P., 146 D.P.R. 64, 130 (1998).

[10] Alejandro Rivera v. E.L.A., 140 D.P.R. 538, 545 (1994); Raimundi v. Productora, *supra*, pág. 228.

[11] P.A.C. v. P.I.P., 169 D.P.R. ___ (2006), 2006 T.S.P.R. 193, 2007 J.T.S. 5, 643; *Ex parte* Irizarry, 66 D.P.R. 672, 676 (1946).

reglamentar.[12] "Dicho de otra manera, un reglamento o actuación administrativa claramente en conflicto, o en contra de la ley, es nulo."[13] Este tipo de disposición reglamentaria tiene que ceder ante el mandato legislativo ya que el texto de una ley jamás debe entenderse modificado o suplantado por el reglamentario, por lo que, de existir cualquier conflicto entre el texto de la ley y su reglamento, debe prevalecer el de la ley.[14]

**B**

Como es sabido, "[c]uando la ley es clara [y] libre de toda ambigüedad, la letra de ella no debe ser menospreciada bajo el pretexto de cumplir su espíritu".[15] En virtud de este mandato, al interpretar un estatuto, debemos comenzar remitiéndonos a su texto, pues "[c]uando el legislador se ha manifestado en lenguaje claro e inequívoco, el texto de la ley es la expresión por excelencia de toda intención legislativa".[16] De esta forma, siendo los términos de un estatuto claros y susceptibles de una interpretación incuestionable según el significado común de sus palabras y de su construcción gramatical, los tribunales no deben intercalar palabras ni suplir

---

[12] Íd.

[13] P.A.C. v. P.I.P., *supra*, pág. 643.

[14] Íd.

[15] 31 L.P.R.A. sec. 14.

[16] Silva v. Adm. Sistemas de Retiro, 128 D.P.R. 256, 269 (1991); Atiles, Admor. v. Comisión Industrial, 77 D.P.R. 16, 20 (1954).

omisiones al interpretarlo.[17] En este sentido, hemos establecido que, "[s]i el lenguaje de un estatuto es tan inequívoco, un sentido cabal de humildad y autodisciplina judicial requiere la aplicación de la voluntad legislativa".[18]

No obstante, todas las leyes, aún aquellas cuyo texto catalogamos como "clarísimo", requieren interpretación.[19] Por esto, como ya expresáramos, en materia de hermenéutica legal "[s]ólo hay una regla que es absolutamente invariable y ésta es que debe descubrirse y hacerse cumplir la verdadera intención y deseo del poder legislativo".[20] De esta forma, al descargar nuestra función de interpretar una disposición particular de un estatuto, debemos siempre considerar cuáles fueron los principios perseguidos por la Asamblea Legislativa al aprobarla, de manera tal que su interpretación asegure el resultado que originalmente se quiso obtener.[21]

En fin, sobre el particular, nos señalan Bernier y Cuevas Segarra que:

---

[17] Irizarry v. Johnson & Johnson, 150 D.P.R. 155, 165 (2000).
[18] Silva v. Adm. Sistemas de Retiro, *supra*, pág. 269; Clínica Juliá v. Sec. de Hacienda, 76 D.P.R. 509, 520 (1954).

[19] Otero de Ramos v. Srio. de Hacienda, 156 D.P.R. 876, 883-884 (2002); Pueblo v. Zayas Rodríguez, 147 D.P.R. 530, 538 (1999); Vélez v. Srio. de Justicia, 115 D.P.R. 533, 544 (1984).

[20] Dorante v. Wrangler of PR, 145 D.P.R. 408, 417 (1998).

[21] J.P. v. Frente Unido I, 165 D.P.R. 445, 472 (2005); Vázquez v. A.R.Pe., 128 D.P.R. 513, 523 (1991).

Bajo un sistema de separación de poderes como el que funciona en Puerto Rico, la Asamblea Legislativa tiene la facultad de aprobar las leyes. El Poder Judicial ejercitado por los tribunales consiste en el ejercicio de las facultades de resolver los litigios a través de la interpretación de la ley. [...] Interpretar una ley en forma que sea contraria a la intención del legislador implica la usurpación por la rama judicial de las prerrogativas de la rama legislativa.[22]

## C

Con relación a la interpretación de estatutos que imponen contribuciones o impuestos, es un principio cardinal de hermenéutica que éstos no se habrán de interpretar de forma extensiva, sino que se deberán interpretar de una forma justa, y a tenor con sus propios y expresos términos.[23] "Lo contrario sería sancionar la oprobiosa y opresiva situación conocida históricamente como *taxation without representation*."[24] En otras palabras, apartarse de este canon de interpretación restrictiva en aquellas instancias en que el Estado pretende imponerle al ciudadano el cobro de una contribución, impuesto o arbitrio, al margen de los propios y expresos términos de la legislación contributiva concerniente, sería violentar principios básicos o de

---

[22] R.E. Bernier y J.A. Cuevas Segarra, Aprobación e interpretación de las leyes en Puerto Rico, San Juan, Pubs. J.T.S., 1987, pág. 299.

[23] Talcott Inter-Amer. Corp. v. Registrador, *supra*, pág. 262.

[24] Íd.

raíces firmes en la jurisprudencia y en el ordenamiento civil.[25]

Ahora bien, "[n]o debe olvidarse que estas reglas de interpretación estricta deben armonizarse con la otra regla que señala que las leyes que imponen contribuciones deben recibir una interpretación razonable, tendiente a llevar a efecto el propósito y la intención del legislador".[26] En cambio, cuando el propósito de imponer una contribución no es claro, esto es, que no surge claramente de la ley, la duda debe resolverse a favor de la no imposición de ésta.[27]

Sobre el particular, citando al Tribunal Supremo de los Estados Unidos de América, hemos expresado:

> En la interpretación de estatutos que imponen contribuciones, es la práctica establecida no extender sus disposiciones, por implicación, más allá del claro alcance del lenguaje usado, o ampliar su radio de manera que comprenda materias que no han sido específicamente señaladas. En caso de duda, se interpretan estrictamente en contra del Gobierno y a favor del ciudadano.[28]

**III**

La Ley Núm. 80 de 17 de octubre de 1992, que enmendó la Ley de Arbitrios del Estado Libre Asociado de Puerto Rico de 1987, Ley Núm. 5 de 8 de octubre de 1987, se

---

[25] Véase, B.B.C. Realty v. Secretario Hacienda, 166 D.P.R. 498, 511 (2005).

[26] Bernier y Cuevas Segarra, *op. cit.*, pág. 466.

[27] B.B.C. Realty v. Secretario Hacienda, *supra*, pág. 511; Central Coloso v. Descartes, Tes., 74 D.P.R. 481, 486 (1953); Plácido Longo & Cia. v. Sancho, 50 D.P.R. 160, 163 (1936).

[28] B.B.C. Realty v. Secretario Hacienda, *supra*, pág. 507 (citando a Gould v. Gould, 245 U.S. 151, 153 (1917)).

aprobó con el objetivo de modificar la base contributiva sobre la cual se calculaba el arbitrio de los vehículos introducidos a Puerto Rico. La Ley Núm. 80, *supra*, estableció, entre otras cosas, que el arbitrio a los vehículos nuevos importados se calcularía a base del "precio sugerido de venta al consumidor", lo que sustituyó el sistema tributario anterior basado en el peso y el caballaje de dichos vehículos.

Posteriormente, en el año 1994, y con el propósito de integrar en un solo documento toda la legislación contributiva, la Asamblea Legislativa aprobó el Código de Rentas Internas de 1994, Ley Núm. 120 de 31 de octubre de 1994, el cual derogó cualquier precepto jurídico anterior que contraviniese sus disposiciones. No obstante, en éste se incorporó lo estatuido por la Ley Núm. 80, *supra*, de tal forma que la definición de lo que constituía el "precio sugerido de venta al consumidor" permaneció prácticamente inalterada. Así, la nueva base contributiva introducida por la Ley Núm. 80, *supra*, según la incorporó el Código de Rentas Internas, se definió como sigue:

> En el caso de automóviles nuevos y de vehículos de uso múltiple nuevos, introducidos al país por distribuidores y traficantes autorizados, el precio sugerido de venta al consumidor incluirá el costo básico del modelo del automóvil nuevo y del vehículo de uso múltiple nuevo incluyendo el equipo opcional instalado de fábrica, más el seguro y flete de importación, el margen de ganancia para la venta, y los costos asociados con la preparación y entrega del vehículo.[29]

---

[29] Sec. 2001(a)(11)(A) del Código de Rentas Internas, *supra*, 13 L.P.R.A. sec. 9001(a)(11)(A) (versión enmendada en *infra*, n. 30). La única alteración que sufrió esta definición a raíz de la aprobación del Código de Rentas

La definición permaneció inalterada hasta que se aprobó la Ley de la Justicia Contributiva de 2006, Ley Núm. 117 de 4 de julio de 2006, la cual, en lo pertinente, introdujo un cambio poco significativo en la definición de "precio sugerido de venta al consumidor" al incluir la palabra "estimada" con relación al criterio del margen de ganancia, para que lea:

> En el caso de automóviles nuevos y de vehículos de uso múltiple nuevos, introducidos al país por distribuidores y traficantes autorizados, el precio sugerido de venta al consumidor incluirá el costo básico del modelo del automóvil nuevo y del vehículo de uso múltiple nuevo incluyendo el equipo opcional instalado de fábrica, más el seguro y flete de importación, el margen de ganancia **estimada** para la venta, y los costos asociados con la preparación y entrega del vehículo.[30]

A pesar de que el concepto de "precio sugerido de venta al consumidor", como base contributiva, sufrió estas alteraciones, es la Ley Núm. 80, *supra*, la que aún figura como el estatuto generador de una estructura tributaria mucho más simple que la anterior.[31] Precisamente, fue la incorporación de un criterio uniforme a base del cual calcular los arbitrios de los distintos tipos de

Internas fue la exclusión de la frase: "los equipos instalados localmente", como un elemento más a tenerse en cuenta al determinar el precio sugerido de venta al consumidor.

[30] Sec. 2001 (a)(11)(A) del Código de Rentas Internas, *supra*, según enmendada por el Art. 16 de la Ley de la Justicia Contributiva de 2006, Ley Núm. 117 de 4 de julio de 2006, 13 L.P.R.A. sec. 9001 (a)(11)(A) (énfasis suplido).

[31] El sistema de peso y caballaje, el cual era el utilizado con anterioridad a la Ley Núm. 80, *supra*, se prestaba a interpretaciones ambiguas que redundaban en perjuicio del Estado y del consumidor.

automóviles nuevos, lo que inspiró a la Asamblea Legislativa a aprobar la Ley Núm. 80, *supra*. La claridad meridiana del nuevo método de tributación se desprende del siguiente fragmento de la exposición de motivos de la Ley Núm. 80, *supra*:

> El precio se establece directamente por el importador-distribuidor y en mutuo acuerdo con el concesionario vendedor, **sin intervención alguna por parte de agentes extra mercado, incluyendo al Estado.** Se establece un mecanismo de rotulación único, que no dé lugar a interpretaciones erróneas o arbitrarias que redunde en perjuicio de los consumidores y de los ingresos del [E]stado. Además, **al determinarse el monto del impuesto a pagar después de establecido el precio sugerido de venta al consumidor, el sistema propuesto podrá beneficiar a los consumidores ya que el monto del impuesto no formará parte del costo del vendedor sobre el cual se calcula el margen de ganancia.** Esta práctica deberá resultar en precios de venta relativamente más bajos para los consumidores.
>
> ........
>
> **El precio sugerido de venta rotulado será el punto de referencia básico** para facilitar que el consumidor pueda determinar el vehículo de motor que comprará y el negocio que patrocinará.[32]

Ahora bien, para instrumentar la aplicación de la nueva base contributiva, el legislador dispuso los elementos a considerar al determinar cuál es el precio sugerido de venta, así como qué mecanismo tiene disponible el Secretario de Hacienda cuando considere que el "precio sugerido de venta al consumidor" no refleja razonablemente el precio real del vehículo. A esos efectos, la Ley Núm.

---

[32] 1992 (Parte 1) <u>Leyes de Puerto Rico</u> 389-390 (énfasis suplido).

80, *supra*, según la incorporó el Código de Rentas Internas, estatuyó:

> (1) *Determinación del precio sugerido de venta.—* El precio sugerido de venta al consumidor de los automóviles nuevos y usados **será determinado por el importador o distribuidor conforme lo dispone esta ley antes de introducir el vehículo a Puerto Rico.** Disponiéndose que el precio sugerido de venta al consumidor, para cada vehículo, no tiene necesariamente que ser igual para todos los concesionarios pero **el arbitrio a pagar se determinará y pagará conforme al precio sugerido de venta al consumidor que aparezca en el rótulo de precios adherido al vehículo y determinado por el distribuidor.**

> (2) *Determinación del Secretario si el precio contributivo no refleja razonablemente el precio del vehículo.—*En caso de que el precio sugerido de venta al consumidor informado por determinado importador no refleje razonablemente el precio sugerido de venta al consumidor de modelos similares **al momento de la introducción del vehículo al país, el Secretario determinará y cobrará a ese importador el impuesto fijado por esta ley, utilizando como referencia cualquier otra fuente de información que sea debidamente reconocida en la industria automotriz de los Estados Unidos.** No obstante, **en ningún caso se entenderá que esta facultad autoriza al Secretario a sustituir, como norma de aplicación general, la base del precio sugerido de venta por cualquier otra base fiscal alterna, excepto para corregir el precio contributivo determinado irrazonablemente por el importador en ese caso particular.**

> La determinación del Secretario se presumirá sin menoscabo de las disposiciones establecidas en el Subtítulo F.[33]

---

[33] Sec. 2011 (c)(1) y (2) del Código de Rentas Internas, *supra*, 13 L.P.R.A. sec. 9014 (c)(1) y (2). El inciso (1) fue enmendado por la Ley de la Justicia Contributiva de 2006 a los únicos efectos de excluir de esta disposición los vehículos de uso múltiples nuevos y usados. Art. 16, Ley de la Justicia Contributiva de 2006, *supra*. Además, cuando la última oración de esta sección lee: "sin menoscabo de las disposiciones establecidas en el Subtítulo F", se refiere a la Sec. 6001 *et seq.* del Código de Rentas Internas, *supra*, 31 L.P.R.A. sec. 8021 *et seq.*

De las disposiciones legales antes transcritas, puede colegirse que la base contributiva estatuida por la Asamblea Legislativa mediante la aprobación de la Ley Núm. 80, *supra*, —incorporadas posteriormente al Código de Rentas Internas— es el "precio **sugerido** de venta al consumidor", el cual será determinado por el importador **previo** a introducir el vehículo a Puerto Rico.[34] No obstante, también se desprende claramente que, en esa etapa, y con el objetivo de evitar el fraude contributivo y obligar al importador a que tribute a base de un precio sugerido de venta que refleje objetivamente el valor del vehículo en el mercado, **el Secretario de Hacienda está facultado para indagar sobre la razonabilidad del precio sugerido informado por el importador.**

Es precisamente en virtud de esa autoridad, que el Secretario de Hacienda podrá determinar y cobrar a ese importador el impuesto no satisfecho como parte de un precio sugerido de venta razonable, sujeto a los términos en los que el Código de Rentas Internas adoptó tal concepto de la Ley Núm. 80, *supra*. Claro está, para así proceder **tendrá que fundamentar** dicha insuficiencia tributaria en alguna fuente debidamente reconocida en la industria automotriz de los Estados Unidos de América, puesto que le está vedado alterar el precio sugerido de venta al consumidor por cualquier otra base fiscal alterna.

---

[34] El término sugerir significa **"proponer o aconsejar algo"**. Real Academia Española, <u>Diccionario de la Lengua Española</u>, 2001, pág. 2106.

Ahora bien, a pesar de que los términos utilizados en la redacción de la Ley Núm. 80, *supra*, son lo suficientemente claros para ser entendidos en un único sentido, resulta indispensable y más que revelador consignar *ad verbatim* diversos fragmentos del debate acaecido en la Cámara de Representantes referentes a la aprobación de la Ley Núm. 80, *supra*. De esta forma, cumplimos nuestra ineludible función de descubrir y hacer cumplir la verdadera intención y el deseo del poder legislativo al adoptar el "precio sugerido de venta" como base contributiva.

A esos efectos, el entonces Presidente de la Cámara de Representantes, señor Jarabo Álvarez, expresó:

> [L]uego de un diálogo abierto con la industria, todos los sectores de la industria, redactamos el Proyecto 1707. Un Proyecto que establecía, en lugar del "black book", el precio de venta al consumidor como base para calcular el arbitrio. Era en cierta forma un "sale tax", un impuesto sobre la venta. En otra forma no lo era, porque como saben los señores legisladores, **un impuesto sobre la venta como el que existe en los Estados de la Unión Federada utiliza la venta al consumidor como el evento contributivo; la obligación de pagar contribución, el "sales tax", surge cuando se vende el artículo al consumidor, y esa base no se podía utilizar en Puerto Rico porque se afectaría el flujo de fondos al Departamento de Hacienda.**
>
> Los arbitrios sobre automóviles representan el cuatro por ciento del total de los recaudos, por lo que cualquier sistema diseñado sobre este asunto, por fuerza tiene que garantizar el flujo sostenido de fondos cobrados por arbitrios al Departamento de Hacienda. **El Proyecto aprobado con respaldo tripartita en la Cámara tenía la peculiaridad de utilizar como base el precio de venta al consumidor, pero manteniendo el evento contributivo como lo tiene la ley actual, la introducción del carro, o automóvil, al mercado de Puerto Rico. De manera que hacía necesario un**

**sistema de estimado. ¿Estimado de qué? Estimado de cuál iba a ser el precio de venta al consumidor en el momento en que se vendiera el carro. Y eso hacía necesario una contabilidad muy complicada en el Departamento de Hacienda por cada vehículo. Un estimado de cuál iba a ser el precio de venta, un pago o afianzamiento, y luego créditos por lo pagado demás** [sic]**, o reducción y cobro por lo pagado de menos. El Departamento de Hacienda dijo, "No podemos administrar un sistema así,** necesitamos un sistema —dijeron— que tenga la certeza, la facilidad, la simpleza, la sencillez, de utilizar el [']black book[']; ¿el [']black book['] es inaceptable? Muy bien, inaceptable, pero **queremos algo que pueda sustituir el criterio objetivo que nos permita superar la situación actual en que hay que tasar cada vehículo";** y eso, como sabemos todos, sin entrar a discutir los detalles, se presta a mucha irregularidad, a muchas cosas raras, a muchas inequidades, cada vez que se tasa un vehículo para determinar qu[é] arbitrio debe pagar.

........

Así las cosas, hemos preparado este Sustitutivo del Proyecto 1707, que utiliza el precio de venta sugerido. **Fíjense que es lo más que se acerca al precio de venta al consumidor, el precio de venta al consumidor sugerido por el fabricante o por el importador al momento de la introducción del carro en Puerto Rico.** O sea, cuando ocurre el evento contributivo, cuando surge la obligación de pagar un arbitrio —igual que ahora—, en lugar de usar la cifra esa elástica, misteriosa, desconfiable, el FOB [entiéndase, el *"free on board"*,] **va a utilizar el cálculo de cuál será el precio de venta al consumidor, que incluye todos los costos, incluyendo las ganancias del importador y el concesionario,** si hay un concesionario distinto al importador. Y ese precio será rotulado y puesto en el cristal del vehículo, de manera que el consumidor vea sobre qué cantidad es que está pagando.

Eso permite una certeza que evita las lagunas y los huecos que tiene la actual ley, y que la hacen vulnerable al fraude. A la misma vez, crea una dinámica de las fuerzas del mercado que obligan a ese fabricante a decir la verdad, porque si trata de subvaluar [sic] ese precio sugerido se va a afectar en su relación con el concesionario. Y si lo exagerara, que sería

absurdo, pagaría más arbitrios de lo que le corresponde pagar, y también se afectaría en su relación con el concesionario. De manera que la garantía de que se va a decir la verdad ahí, está no sólo en las penalidades contributivas por cometer fraude —porque eso es fraude—, sino también en **las fuerzas naturales de la competencia económica que promueven que verdaderamente se identifique el precio sugerido como el precio real al que se espera que se venda ese vehículo.**

........

Creo ... que he cubierto ... adecuadamente la intención legislativa de esta medida y los aspectos más fundamentales de la misma.[35]

De los fragmentos transcritos se desprende claramente que con la aprobación de la Ley Núm. 80, *supra*, el legislador precisamente pretendió que no se utilizara la venta del vehículo al consumidor como el evento contributivo, pues ello equivalía a la imposición de un impuesto a la venta que, como base contributiva, no se podría utilizar en Puerto Rico porque afectaría el flujo de fondos al propio Departamento de Hacienda. Como vemos, el proyecto de ley que finalmente se convirtió en la Ley Núm. 80, *supra*, sustituyó otro proyecto de ley que en esencia proponía implantar el sistema tributario que instituyó el Secretario de Hacienda, esto es, utilizar como el evento contributivo la introducción del vehículo al mercado de Puerto Rico, pero empleando el precio de venta final al consumidor como la base contributiva.

Según lo concibió el legislador, ese sistema de imposición de arbitrios, al carecer de correlación

---

[35] <u>Diario de Sesiones de la Cámara de Representantes</u>, 2 de octubre de 1992, págs. 54-55 y 59 (énfasis suplido).

temporal, implica una contabilidad muy complicada en el Departamento de Hacienda. Requiere que se paguen las contribuciones al momento de la introducción del vehículo a base de un estimado de cuál va a ser el precio de venta al consumidor, para luego, tras realizarse la venta por parte del concesionario, evaluar y calcular la diferencia que surge entre el estimado y la venta final. Calculada la diferencia, le corresponde al Secretario de Hacienda computar los arbitrios sobrevenidos para entonces imponerle al importador el pago de éstos.

Sin embargo, se desprende del debate parlamentario que fue la propia agencia la que instó al legislador a no aprobar tal estructura contributiva, sino que abogó por una que contuviere un criterio objetivo como el del *black book*, **y así dejar a un lado el criterio incierto de la venta final de cada vehículo. Ello así, puesto que además de que constituía un engorroso sistema tributario, resultaba ser perjudicial para cada consumidor puertorriqueño que se aprestara a adquirir un automóvil nuevo de un concesionario que no importa vehículos, toda vez que no podrá inscribirlo en el DTOP hasta tanto el importador, con quien no mantuvo ninguna relación comercial, gestionara el pago de dichos arbitrios sobrevenidos.**

## IV

La Ley Núm. 80, *supra*, facultó al Secretario de Hacienda para que reglamentara todas las normas necesarias para su aplicación. Así, el 18 de enero de 1994, la

agencia aprobó el Reglamento 5020, por medio del cual dispuso que en caso de que se vendiera un vehículo en exceso del precio sugerido de venta al consumidor, ello se tenía que evidenciar ante la agencia para determinar si el incremento estaba sujeto al pago de arbitrios adicionales. De esta forma, tal cual argumentó el Estado, desde la aprobación del Reglamento 5020 el Secretario de Hacienda instituyó que la declaración de la venta y el pago por la diferencia en arbitrios era un requisito previo para la otorgación de una certificación de pago de arbitrios válida para la inscripción en el DTOP.

Ahora bien, el Reglamento 5020 fue derogado por el Reglamento 7215 de 1 de septiembre de 2006, el cual a su vez fue derogado por el Reglamento 7437 de 14 de diciembre de 2007. No obstante, tanto el Reglamento 7215 como el Reglamento 7437 mantuvieron esencialmente las mismas disposiciones reglamentarias en cuanto al asunto que nos atañe se refiere. Por lo tanto, con la aprobación del Reglamento 7437 se sostuvo el sistema tributario implantado a partir del Reglamento 5020, esto es, al presente, se mantiene el requisito de tener que mostrar evidencia ante la agencia sobre si un vehículo se vende en exceso del precio sugerido de venta al consumidor. Así también, para la emisión de una certificación de pago de arbitrios válida, actualmente la agencia exige presentar la declaración de la venta y realizar el pago por la diferencia en arbitrios.

En este sentido, según dispone la cláusula de retroactividad incluida en el Reglamento 7437, éste no alteró las normas reglamentarias vigentes a partir de la aprobación del Reglamento 5020. De esta forma, y en vista de que mediante el recurso presentado ante nuestra consideración se solicita que se declare inválida la facultad arrogada por el Secretario de Hacienda mediante la referida reglamentación, por estar el caso de autos aún en trámite, evaluaremos las disposiciones del Reglamento 7437 que es el que está vigente.

En cuanto al concepto de "precio sugerido de venta al consumidor", el Reglamento 7437 dispone:

> (i) "Automóviles nuevos para la venta": En el caso de automóviles nuevos, introducidos al país por distribuidores y traficantes autorizados, el "precio sugerido de venta al consumidor" significará aquel precio por el cual el vehículo o vehículos similares serán vendidos al detal al público consumidor en el mercado libre, excluyendo el arbitrio.
>
> Este "precio sugerido de venta al consumidor" nunca podrá ser menor del costo básico del modelo. El "precio sugerido de venta al consumidor" incluirá el costo básico del modelo y lo siguiente: el equipo opcional instalado en fábrica, los seguros y fletes de importación, el margen de ganancia para la venta, los costos asociados con la preparación y entrega del vehículo, y cualquier otro costo relacionado con la entrega del vehículo. Disponiéndose, sin embargo, que el "precio sugerido de venta al consumidor" no tiene necesariamente que ser igual para todos los concesionarios. [...] **Toda declaración de venta en exceso del precio sugerido de venta al consumidor será examinada para determinar si el incremento está sujeto al pago de arbitrios adicionales.**[36]

---

[36] Art. 2001-1, (25)(i), Reglamento 7437 (énfasis suplido) (disposición similar al derogado Art. 3 (14)(a), Reglamento 5020).

Además, el Art. 2011(a)-4 del Reglamento 7437 especifica el procedimiento a llevarse a cabo para la declaración de arbitrios en los casos de los automóviles:

(a) Distribuidores.- (1) Todo distribuidor que se proponga introducir automóviles a Puerto Rico, someterá al Secretario una declaración de arbitrios, 15 días antes de la fecha de autorización del levante de los embarques del muelle, incluyendo una relación detallada de los automóviles a ser recibidos, con el precio sugerido de venta al consumidor para cada uno y la información que se establece más adelante. El distribuidor incluirá cualquier otro documento que el Secretario determine.

........

(4) En el caso de distribuidores que importan automóviles nuevos a Puerto Rico y que mantienen una relación comercial con uno o más vendedores de vehículos de motor al detal ("dealers"), a los fines de que esos vendedores de vehículos de motor al detal realicen las ventas al detal de dichos automóviles, el precio sugerido de venta al consumidor dispuesto en el inciso (1) de este párrafo **será aquel que el vendedor de vehículos de motor al detal utilizará para la venta de dichos vehículos al detal.**

Esto presupone que el distribuidor determinará el precio sugerido de venta al consumidor para el embarque correspondiente, incluyendo todos los elementos de precio necesarios que hacen posible la presentación de los automóviles al público consumidor y que constituyen el precio de oferta de esos automóviles al detal.

........

(d) Declaración de arbitrios enmendada por cambio en el precio sugerido de venta.- (1) **En el caso de que el distribuidor o traficante autorizado, según aplique, incluya en la declaración de arbitrios y en la correspondiente etiqueta adhesiva, un precio sugerido de venta al consumidor menor al precio de oferta al detal que el vendedor de vehículos de motor al detal ("dealer") o concesionario exhibirá en el vehículo particular, será responsabilidad del distribuidor** o traficante autorizado, según sea el caso, rendir ante el Director una declaración de arbitrios enmendada que refleje el precio

sugerido de venta al consumidor correcto, y **satisfacer el pago de arbitrios correspondiente por la diferencia en la base contributiva**. En este caso, el Negociado entregará, emitirá o permitirá al distribuidor o traficante autorizado, según corresponda, imprimir una nueva etiqueta adhesiva, que reflejará el nuevo precio sugerido de venta al consumidor y que sustituirá la etiqueta que originalmente se le entregó o autorizó a imprimir a dicho distribuidor o traficante autorizado para el vehículo en particular.

(2) No obstante lo anteriormente dispuesto, **cuando sea el vendedor de vehículos de motor al detal ("dealer") el que gestione un aumento al "precio sugerido de venta al consumidor", el vendedor de vehículos de motor al detal notificará inmediatamente al distribuidor o traficante autorizado, según sea el caso, su deseo de solicitar el aumento y la emisión de una nueva etiqueta adhesiva acompañando con la solicitud el importe de los arbitrios correspondiente a la diferencia en la base contributiva.** Una vez el distribuidor o traficante autorizado, según sea el caso, reciba la solicitud del vendedor de vehículos de motor al detal, el distribuidor o traficante autorizado entonces presentará la misma ante el Director y se emitirá o autorizará la impresión de una nueva etiqueta.

En caso de que el vendedor de vehículos de motor al detal notifique al distribuidor o traficante autorizado un "precio sugerido de venta al consumidor" mayor al que hubiese declarado el distribuidor o traficante autorizado, y el automóvil aún no se haya introducido en Puerto Rico, el distribuidor o traficante autorizado estará obligado a declarar dicha unidad con el "precio sugerido de venta al consumidor" que el vendedor de vehículos de motor al detal informe.

**En aquellos casos en que el "dealer" no informe al distribuidor o traficante autorizado su intención de aumentar el "precio sugerido de venta al consumidor" y no acompañe el pago de arbitrios por la diferencia, será responsabilidad de dicho "dealer" el pago de los arbitrios por la diferencia, más los intereses, penalidades, multas y recargos correspondientes.** No obstante, en aquellos casos donde el "dealer" notifique por escrito al distribuidor o traficante autorizado el "precio sugerido de venta al consumidor" para un vehículo en

particular, el distribuidor o el traficante autorizado deberá declarar dicho vehículo con el "precio sugerido de venta al consumidor" notificado por dicho "dealer".

(3) **El pago de los arbitrios correspondientes por la diferencia en la base contributiva se efectuará dentro de los 15 días siguientes a la fecha de venta** o dentro de los 15 días siguientes a la fecha en que el traficante autorizado o vendedor de vehículos de motor al detal haya permitido el uso de los vehículos en las vías públicas, lo que ocurra primero.

(4) **En aquellos casos en que un vendedor de vehículos de motor al detal venda un vehículo introducido por un traficante autorizado y éste no informe el aumento en el precio sugerido de venta al consumidor, el traficante autorizado (introductor) tendrá la responsabilidad de pagar la diferencia en arbitrios más los intereses, recargos, penalidades y multas correspondientes, sobre la diferencia entre el precio de venta final al consumidor y el precio sugerido de venta especificado en la declaración original.**[37]

De una lectura de las disposiciones reglamentarias transcritas, puede colegirse que el sistema tributario implementado por el Secretario de Hacienda es nulo, pues está en conflicto con los preceptos legales establecidos en el propio Código de Rentas Internas. Veamos.

El procedimiento reglamentario para la declaración de arbitrios obliga al importador o distribuidor que, con posterioridad al evento contributivo, notifique al Departamento de Hacienda el precio en que finalmente todo concesionario negoció cada uno de los vehículos nuevos que

[37] Art. 2011(a)-4, (a)(1), (a)(4), (d), Reglamento 7437 (énfasis suplido) (disposiciones similares al derogado Art. 4 (A)(1), (A)(4), (A)(5), Reglamento 5020). Cabe destacar que el término "distribuidor" está definido como "aquel importador que tiene una relación de distribuidor exclusivo con el fabricante de vehículos de motor y que representa a dicho fabricante en Puerto Rico". Art. 2011(b)-1, (a)(5)(disposición similar al derogado Art. 3 (9), Reglamento 5020).

le distribuyó. Además, exige que esta notificación esté acompañada del pago de los arbitrios que emanan de la diferencia que surge entre el precio sugerido de venta declarado por el importador al momento del embarque y el precio en que efectivamente el concesionario efectuó la venta del vehículo.

De esta forma, tanto el requerimiento de la notificación como el del pago de arbitrios adicionales constituye una autoridad arrogada por el Secretario de Hacienda que no sólo se encuentra ausente en el Código de Rentas Internas, sino que contraviene la letra clara del fundamental estatuto. Y es que el referido Código establece, de forma diáfana, que el Secretario de Hacienda **puede intervenir o exigir el pago adicional de arbitrios sólo si el precio sugerido de venta no refleja razonablemente el precio del vehículo, lo que tiene que determinar previo a permitir el embarque de éste.**[38] Incluso, esta facultad del Secretario para decretar que el precio sugerido de venta informado por el distribuidor es irrazonable para ese modelo de automóvil, **tendrá que estar fundamentada en cualquier fuente de información debidamente reconocida en la industria automotriz de los Estados Unidos de América.**[39]

Indudablemente, una fuente de información reconocida en la industria automotriz no puede ser la definición que

---

[38] Sec. 2011(c)(2) del Código de Rentas Internas, *supra*, 13 L.P.R.A. sec. 9014(c)(2).

[39] Íd.

el propio Secretario de Hacienda, mediante la aludida reglamentación, pueda otorgarle a la base contributiva del "precio sugerido de venta al consumidor". Más aún cuando los términos en que está redactada dicha definición reglamentaria amplían la base contributiva estatutaria de tal forma que la equipara a lo que constituye el precio final de venta. Ello, puesto que mediante la referida definición el **Secretario se atribuye la facultad de examinar "[t]oda declaración de venta en exceso del precio sugerido de venta al consumidor ... para determinar si el incremento está sujeto al pago de arbitrios adicionales".**[40]

Además, examinar una declaración de venta de un vehículo obligatoriamente nos conduce a una etapa posterior a aquélla en que se declaró el precio sugerido de venta por parte del importador y que fue aprobado por el Secretario de Hacienda. En otras palabras, el hecho de que un concesionario no importador efectúe la venta de un vehículo, necesariamente implica que ya se produjo el embarque del vehículo con la anuencia del Secretario en virtud del precio sugerido informado. Por lo tanto, en esa etapa del procedimiento, ha quedado extinta la facultad del Secretario para determinar si el precio sugerido de venta refleja o no razonablemente el precio del vehículo a los efectos de emitir una certificación de pago de arbitrios. Ello, debido a que el Código de Rentas Internas dicta que **la potestad del Secretario de cobrar al distribuidor el impuesto a base de un precio sugerido de**

---

[40] Art. 2001-1, (25)(i), Reglamento 7437.

**venta razonable, se realizará "al momento de la introducción del vehículo al país".**[41]

Por otro lado, es menester puntualizar que el Código expresamente dispone que la facultad delegada al Secretario de Hacienda de determinar la razonabilidad del precio sugerido de venta previo al embarque, **en ningún caso se entenderá que le autoriza a sustituir, como norma de aplicación general, la base del precio sugerido de venta por cualquier otra base fiscal alterna.**[42] En vista de lo anterior, y como el sistema tributario implementado mediante la referida reglamentación contraviene este precepto legal —pues precisamente constituye una alteración ilegal y de aplicación general de la base contributiva—, nos vemos obligados a declararlo nulo.

Asimismo, debemos destacar que como parte de este sistema tributario que por la presente anulamos, está la disposición reglamentaria que coloca al concesionario en la posición del contribuyente. Sobre el particular, el Reglamento 7437 dispone que **cuando el concesionario no le informa al importador o distribuidor su intención de vender el vehículo a un precio mayor que el previamente sugerido para la venta y, en consecuencia, no acompaña el pago de arbitrios por la diferencia resultante, dicho concesionario será responsable del pago de esos arbitrios más los intereses, las penalidades, las multas y los**

---

[41] Sec. 2011(c)(2) del Código de Rentas Internas, *supra*, 13 L.P.R.A. sec. 9014(c)(2).

[42] Íd.

**recargos correspondientes.**[43] Como se aprecia, esta disposición reglamentaria está claramente en conflicto con el Código de Rentas Internas en la medida en que éste expresamente estatuye que en los casos de los artículos importados que estén gravados con el pago de arbitrios, "la persona responsable del pago de los impuestos o contribuyente lo será ... [e]l consignatario, si el artículo viene consignado directamente a un consignatario".[44]

La consecuencia ineludible de mantener vigente el sistema tributario antes descrito sería permitir que el Secretario de Hacienda sustituya el criterio del legislador por el suyo, toda vez que este funcionario exige que se tribute por el precio final de venta con posterioridad al embarque del vehículo, y no por el precio sugerido de venta según determinado y aceptado por él previo al embarque, en aquellos casos en que el precio final de venta sea mayor al sugerido.[45] Además, sustituye

_____

[43] Art. 2011(a)-4, (d)(2), Reglamento 7437.

[44] Sec. 2051(a)(1) del Código de Rentas Internas, *supra*, 13 L.P.R.A. sec. 9068(a)(1).

[45] Cabe resaltar que la sustitución del criterio del legislador por parte del Secretario de Hacienda resulta ser particularmente conveniente para la agencia, pues mediante el procedimiento implantado no se reevalúa el precio sugerido de venta en aquellos casos en que el precio final de venta al consumidor es menor al precio sugerido de venta declarado por el importador, por lo que no se reintegra dinero alguno al contribuyente a pesar de que se le cobró el arbitrio por una cantidad mayor al precio final de venta. Recordemos que mediante la definición reglamentaria de lo que constituye el precio sugerido de venta, el Secretario se atribuyó la facultad de examinar "[t]oda declaración de **venta en exceso** del precio sugerido de venta al consumidor ... para determinar si el incremento está

el juicio legislativo al posicionar al concesionario —no importador de vehículos— en el lugar del consignatario, quien figura como el contribuyente ante la ley. Como tal, este funcionario ha implementado un sistema contributivo contrario al dispuesto en el Código de Rentas Internas, lo que constituye una actuación *ultra vires*. Por lo tanto, las disposiciones del Reglamento 7437 que instrumentan el sistema tributario aludido, tienen que ceder ante el mandato legislativo pues, como sabemos, el texto de una ley jamás debe entenderse modificado o suplantado por el reglamentario.[46]

## V

La capacidad del Secretario de Hacienda de notificar una deficiencia contributiva con posterioridad al embarque del vehículo, mediante el procedimiento formal dispuesto en la Sec. 6002 del Código de Rentas Internas, 13 L.P.R.A. sec. 8022, no es lo que está en controversia en el presente caso. **Lo que está aquí en controversia es la capacidad del Secretario para, tras el embarque del vehículo, rehusarse a emitir una certificación de pago de arbitrios válida a pesar de que en su momento entendió que el precio sugerido de venta informado por el importado era razonable, pues precisamente por ello se procedió con la introducción del vehículo al país.**

---

sujeto al pago de arbitrios adicionales". Art. 2001-1, (25)(i), Reglamento 7437 (énfasis suplido).

[46] P.A.C. v. P.I.P., *supra*, pág. 643; *Ex parte* Irizarry, *supra*, pág. 676.

De esta forma, si el Secretario de Hacienda pretende variar el arbitrio fijado luego de haber otorgado su anuencia para el embarque del vehículo —por entender en ese momento que el precio sugerido de venta informado por el importador era razonable—, tendrá que regirse por el procedimiento formal establecido en el Subtítulo F, Sec. 6002 del Código de Rentas Internas. Ello, debido a que la Sec. 2011(c)(2) del Código dispone que "[l]a determinación del Secretario se presumirá sin menoscabo de las disposiciones establecidas en el Subtítulo F".[47]

El procedimiento estatuido en la referida Sec. 6002 impone, en síntesis, la obligación del Secretario de Hacienda de notificarle al contribuyente su determinación de deficiencia contributiva y proveerle la oportunidad de impugnarla, para luego agotar los remedios administrativos o cuestionar la deficiencia notificada mediante un juicio *de novo* en el Tribunal de Primera Instancia.[48] Claro está, la disponibilidad de este procedimiento surge con posterioridad a la declaración de arbitrios y al embarque del vehículo, es decir, luego del pago de las contribuciones según las declaró el importador y las aceptó o las alteró el Secretario. Esto, en virtud de que **la Sec. 2011(c)(9) del Código supedita la no inscripción del vehículo en el DTOP a la falta de pago del arbitrio según lo fija el procedimiento establecido en la propia Sec. 2011**

---

[47] Sec. 2011(c)(2) del Código de Rentas Internas, *supra*, 13 L.P.R.A. sec. 9014(c)(2).
[48] Sec. 6002 del Código de Rentas Internas, *supra*, 13 L.P.R.A. sec. 8022.

**(c)(1), la cual establece que éste queda fijado a partir de la anuencia o de la alteración por parte del Secretario de la declaración del precio sugerido de venta que emite el importador previo a la autorización del embarque.**[49]

Como vemos, bajo la Sec. 2011 el cobro del arbitrio no está sujeto a un procedimiento de adjudicación formal como el establecido en la Sec. 6002, sino que el cobro del arbitrio está garantizado con la facultad del Secretario de impedir el embarque y el registro en el DTOP —al poderse negar a emitir una certificación de pago de arbitrios válida—. De esta forma, la facultad del Secretario bajo la Sec. 2011 de impedir el registro del vehículo, termina con su anuencia para el embarque y el pago de los arbitrios según informados por el importador, o según alterados por el funcionario dentro del periodo de 15 días dispuesto en esa sección.[50] Por lo tanto, concluimos que el procedimiento establecido en la Sec. 2011 para determinar el precio sugerido de venta en calidad de arbitrio, y la facultad del Secretario bajo dicha sección de impedir el registro en el DTOP, es un procedimiento muy distinto al procedimiento formal de determinación de deficiencia contributiva establecido en la Sec. 6002.

Ahora bien, es menester tener en cuenta que ambos procedimientos son de aplicación exclusiva al importador (distribuidor o consignatario) en la medida en que es éste

---

[49] Sec. 2011(c)(2) del Código de Rentas Internas, *supra*, 13 L.P.R.A. sec. 9014(c)(2).

[50] Sec. 2011(c)(4) del Código de Rentas Internas, *supra*, 13 L.P.R.A. sec. 9014(c)(4).

el contribuyente según dispone el Código de Rentas Internas. En consecuencia, el concesionario que no importa vehículos no está sujeto a ninguno de ambos procedimientos.

**VI**

A pesar de que el Código de Rentas Internas provee procedimientos distintos para verificar el arbitrio a pagarse por cada vehículo, dependiendo de la etapa en que el tributo esté en controversia, la práctica errada del Secretario de Hacienda es no emitir una certificación de pago de arbitrios válida hasta tanto se satisfaga la cantidad de arbitrios que resulte de la base contributiva ilegalmente impuesta, esto es, el precio de venta final del vehículo. De esta forma, cuando el precio de venta final del vehículo es mayor al precio sugerido de venta reportado por el importador, los consumidores adquieren los vehículos de un concesionario pero no pueden disfrutar de éste pues, sin una certificación de pago de arbitrios válida, están impedidos de registrarlos en el DTOP. Esto, debido a que el Reglamento 7437, en torno a la emisión de la certificación de pago de arbitrios, también de manera *ultra vires* dispone:

> **Luego de efectuada la venta al detal del automóvil, el vendedor** de vehículos de motor al detal (o concesionario), importador o distribuidor, **someterá ante el Departamento el Boleto de Verificación de Venta del Vehículo de Motor, Parte B de la etiqueta, debidamente completada, o cualquier otro documento que requiera el Secretario y que sea demostrativo de la venta. Esto constituirá un requisito previo a que el Secretario entregue** a dicho vendedor de vehículos de motor al detal (o concesionario),

importador o distribuidor **la Certificación de Pago de Arbitrios que permitirá registrar el automóvil en el Departamento de Transportación y Obras Públicas.**[51]

De esta forma, al amparo de una insuficiencia en el pago de arbitrios que realmente no es tributable pues es inválida en derecho, el Departamento de Hacienda grava los automóviles introducidos a Puerto Rico e impide que sean inscritos como corresponde en el DTOP. Es precisamente la no expedición de una certificación de pago válida lo que impide la inscripción del vehículo en el DTOP, toda vez que el Código de Rentas Internas dispone que el Secretario de Transportación y Obras Públicas no emitirá a persona alguna una licencia o tablilla para un vehículo **a menos que la persona muestre evidencia fehaciente del pago del arbitrio**, entiéndase, a menos que el Secretario de Hacienda emita la correspondiente certificación de pago de arbitrios sin limitación alguna de su faz.[52]

**VII**

Conforme a nuestro ordenamiento constitucional, "la facultad para imponer contribuciones compete primordialmente a la Rama Legislativa".[53] A esos efectos, el legislador fue claro al establecer en el Código de Rentas Internas que la base contributiva es el "precio

---

[51] Art. 2011(c)(3)-5(a), Reglamento 7437 (énfasis suplido) (disposición similar al derogado Art. 9(6), Reglamento 5020).

[52] Sec. 2011(c)(9) del Código de Rentas Internas, *supra*, 13 L.P.R.A. sec. 9014(c)(9).

[53] Café Rico, Inc. v. Mun. Mayagüez, 155 D.P.R. 548, 552 (2001); véase, Art. VI, Sec. 2, Const. E.L.A., L.P.R.A., Tomo 1.

sugerido de venta al consumidor", el cual lo determina el importador antes de introducir el vehículo a Puerto Rico. Ciertamente, la definición estatutaria de dicho concepto incluye un componente de margen de ganancia —actualmente, margen de ganancia estimada—, pero éste también se determina al momento del embarque, por lo que no es equiparable al precio en que posteriormente lo logre vender el concesionario. Tanto así, que del propio historial legislativo se desprende que el legislador concibió el precio sugerido de venta como "lo más que se acerca al precio de venta al consumidor",[54] por lo que resulta forzoso concluir que el precio sugerido de venta no es lo mismo que el precio final de venta, aún cuando el primero contenga el margen de ganancia para la venta como un componente a tenerse en cuenta. Equiparar el uno con el otro equivale a establecer como base contributiva un impuesto sobre la venta, lo cual, como vimos, el legislador buscó evitar sin excepción alguna.

Más aún, del debate legislativo transcrito anteriormente se deriva que la Asamblea Legislativa consideró la posibilidad de establecer el momento de la venta final al consumidor como el evento contributivo, según proponía el proyecto original, pero lo rechazó. Por esta razón, se sometió un proyecto sustitutivo que fue el que finalmente incorporó el precio sugerido de venta al consumidor como base contributiva. En fin, que de haber

---

[54] Diario de Sesiones de la Cámara de Representantes, 2 de octubre de 1992, pág. 55.

sido la intención legislativa utilizar el precio de venta final como base para el cómputo de los arbitrios, éste se hubiese consignado expresamente en la ley toda vez que dicha posibilidad fue contemplada por la legislatura.

En este sentido, el Secretario de Hacienda, mediante la reglamentación antes discutida, excede sus facultades y actúa ilegalmente al utilizar el precio final de venta al consumidor para reevaluar el precio sugerido de venta que dispone la ley como base para calcular el arbitrio, pues sustituye el criterio objetivo fijado por la Asamblea Legislativa por el suyo, el cual fue específicamente descartado por el legislador. Además, al imponer su criterio mediante el proceso de reglamentación, según lo hemos reseñado, el Secretario de Hacienda viola el mandato legislativo al: (a) pretender cobrar el arbitrio al concesionario; (b) no emitir una certificación de pago válida para que los consumidores puedan inscribir sus vehículos en el DTOP luego de acontecido al evento contributivo; y (c) establecer una base tributaria alterna para la determinación de los arbitrios sobre los vehículos.

Por ello, en nuestra función revisora de reglamentos administrativos, determinamos que la reglamentación que instrumenta el sistema tributario impuesto por el Secretario de Hacienda para determinar el pago de los arbitrios en el caso de los automóviles es nula, toda vez que el legislador reconoció únicamente el precio sugerido de venta como la base contributiva para los vehículos de

motor importados, el que se determina al momento de la introducción de éstos al país. De esta forma hacemos valer el principio elemental de que cuando la legislatura delega en una agencia el poder para promulgar reglamentos, éstos, para ser válidos, no pueden estar en conflicto con las normas establecidas en la propia ley, pues ello conlleva la sustitución del criterio del legislador por el de la agencia autorizada a reglamentar.[55]

En este sentido, las disposiciones reglamentarias concernientes tienen que ceder ante el mandato legislativo ya que el texto del Código de Rentas Internas no puede entenderse modificado o suplantado por el reglamentario. Téngase en cuenta que al encontrarnos ante un estatuto que impone contribuciones o impuestos, es nuestro deber interpretarlo restrictivamente, de forma justa, y a tenor con sus propios y expresos términos. Por esta razón, estamos obligados a decretar inválidos: el inciso (25)(i) del Art. 2001-1, los incisos (a)(4) y (d) del Art. 2011(a)-4, y el Art. 2011(c)(3)-5 del Reglamento 7437.[56]

---

[55] P.A.C. v. P.I.P., *supra*, pág. 643; *Ex parte* Irizarry, *supra*, pág. 676.

[56] Es menester puntualizar que el hecho de que declaremos nulas estas disposiciones reglamentarias no implica que el Reglamento 7437 es nulo en su totalidad, pues en éste se incluyó una cláusula de separabilidad que dispone:

> Si cualquier artículo, párrafo, inciso, cláusula, subcláusula o parte de este Reglamento fuese declarado inconstitucional o nulo por un tribunal con jurisdicción, la sentencia dictada a esos efectos no invalidará el resto de este Reglamento, quedando sus efectos limitados a[l] artículo, párrafo, inciso, cláusula, subcláusula o parte de este Reglamento que fuere declarado inconstitucional o nulo.

**Tal como corresponde, al realizar el análisis restrictivo del estatuto ante nuestra consideración, se desprende claramente que la Asamblea Legislativa no dejó al Departamento de Hacienda desprovisto de un procedimiento que le permitiese fiscalizar la aplicación de la nueva base contributiva.** Si el Secretario de Hacienda no está conforme con el precio sugerido de venta declarado por el importador, previo al embarque del vehículo, el Código de Rentas Internas le provee un mecanismo mediante el cual puede modificarlo y cobrar los arbitrios correspondientes a base de un precio sugerido de venta razonable. En específico, sólo puede modificar el precio sugerido de venta determinado por el importador cuando éste no sea razonable en comparación con el de modelos similares al momento de la introducción del vehículo a Puerto Rico, siempre que dicha irracionabilidad esté fundamentada en una fuente de información debidamente reconocida por la industria automotriz.[57] Sin embargo, la sustitución del precio sugerido de venta por parte del Secretario de Hacienda no puede realizarse de forma generalizada ni como pretexto para sustituir la base del precio sugerido de venta por cualquier otra base fiscal alterna.[58]

**Si el Secretario de Hacienda asiente al precio sugerido de venta declarado por el importador y no le**

---

[57] Sec. 2011(c)(1) del Código de Rentas Internas, *supra*, 13 L.P.R.A. sec. 9014(c)(1).

[58] Sec. 2011(c)(2) del Código de Rentas Internas, *supra*, 13 L.P.R.A. sec. 9014(c)(2).

**notifica la sustitución de éste por uno más razonable conforme el procedimiento aludido, el arbitrio queda fijado. Una vez fijado, el importador paga el arbitrio según aceptado o según sustituido por el Secretario, e introduce el vehículo a Puerto Rico libre de gravamen, esto es, con el derecho a obtener una certificación de pago de arbitrios válida.**

En virtud de lo anterior, teniendo en cuenta que en el presente caso el Secretario de Hacienda no realizó determinación alguna sobre si el precio sugerido de venta al consumidor informado por Motorambar era irrazonable, quedó fijado el arbitrio y se procedió con el embarque de los vehículos posteriormente adquiridos por Yiyi Motors. Así las cosas, el Secretario no podía impedir la inscripción de éstos ya que, por haber quedado fijado el arbitrio, la Sec. 2011(c)(9) del Código de Rentas Internas no se lo permite.[59] Más bien, el criterio que utilizó el Secretario para impedir la inscripción fue la diferencia resultante entre el precio sugerido de venta al consumidor informado por Motorambar —aceptado por el propio Secretario— y el precio en que finalmente Yiyi Motors vendió los vehículos a los consumidores. Sin embargo, como se ha establecido, dicho criterio fue rechazado por la Asamblea Legislativa y, conforme a ello, hoy es descartado por este Tribunal.

---

[59] Sec. 2011(c)(9) del Código de Rentas Internas, *supra*, 13 L.P.R.A. sec. 9014(c)(9).

Por lo tanto, en la medida en que el Secretario se arroga la facultad de impedir el registro de los vehículos mediante la no expedición de una certificación de pago de arbitrios válida luego de fijados los arbitrios y efectuado el embarque, este funcionario actúa ilegalmente. Y al así actuar, le causa daños a Yiyi Motors ya que éste, como es de esperarse de un concesionario de vehículo de motor altamente conocido en este país, ha vendido cientos de vehículos, los que no ha podido inscribir por carecer de una certificación de pago de arbitrios válida.

**VIII**

Establecida la falta de autoridad del Secretario de Hacienda para imponer el aludido sistema tributario, pasemos a considerar la procedencia del *injunction* solicitado por Yiyi Motors.

De entrada, debemos tener en cuenta que en el presente caso no existe controversia sobre el hecho de que el contribuyente lo es Motorambar en calidad de consignatario, no así Yiyi Motors –quien figura como concesionario que no importa vehículos de motor–, pues, como ya expusimos, el Estado no recurrió del dictamen emitido a esos efectos por el Tribunal de Primera Instancia.

El Código de Rentas Internas dispone diáfanamente que en los casos de artículos importados que estén gravados con el pago de arbitrios, "la persona responsable del pago de los impuestos o contribuyente lo será ... [e]l consignatario, si el artículo viene consignado directamente

a un consignatario".[60] Desde esta perspectiva, resulta forzoso razonar que el hecho de que el Secretario de Hacienda haya intentado cobrar contribuciones a quien claramente no es un contribuyente ante la ley, constituye una actuación extraordinaria y palmariamente ilegal que un tribunal de justicia no puede refrendar.

Sobre este particular, en <u>Durlach Bros., Inc. v. Domenech, Tes.</u>, 47 D.P.R. 654 (1934), se estableció que cuando se intenta cobrar de cierta persona contribuciones que, de ser adeudadas, son debidas por otra, se considera que ello presenta un caso excepcional en el que los tribunales pueden ejercer su jurisdicción de naturaleza extraordinaria mediante la concesión del *injunction*.[61] **Así decidimos hace exactamente tres cuartos de siglo atrás, no empece a que la Ley de *Injuction* prohibía, y aún prohíbe, la expedición de este tipo de recurso para impedir la imposición o cobro de cualquier contribución establecida por ley**.[62] Ahora bien, téngase en cuenta que dicha prohibición estatutaria es efectiva únicamente para cuando quien presenta el *injunction* para impedir el cobro de contribuciones es el contribuyente ante la ley, esto es, Motorambar en el caso de autos. Ello así, toda vez que el deber de "pagar las contribuciones bajo protesta ... es aplicable únicamente a personas que están sujetas al pago

---

[60] Sec. 2068 del Código de Rentas Internas, *supra*, 13 L.P.R.A. sec. 9068.

[61] <u>Durlach Bros., Inc. v. Domenech, Tes.</u>, 47 D.P.R. 654, 656 (1934).

[62] <u>Íd</u>.; 32 L.P.R.A. sec. 3524(7).

de contribuciones según las leyes de Puerto Rico. [...] Naturalmente, en un caso corriente las contribuciones deben ser pagadas bajo protesta".[63]

Más aún, hemos señalado que cuando se presenta una demanda de *injunction* para impedir el cobro de contribuciones y el demandante aduce un caso claro en cuanto a que éstas no son pagaderas en forma alguna por él, no es necesario probar daños irreparables más allá de los alegados de manera general en la demanda.[64] En este sentido, en Durlach Bros., Inc. v. Domenech, Tes., *supra*, se culminó la exposición del caso de la misma forma que hoy podríamos hacerlo:

> Haciendo un ligero resumen de los méritos: la demandante adujo un caso claro de que las contribuciones cuya devolución se trataba de obtener no eran pagaderas en forma alguna por la demandante Durlach Brothers.
>
> Cuando los hechos son tan claros como en el presente caso, no es necesario que la demandante pruebe daños irreparables en adición a los alegados en la demanda. Daños irreparables serían la necesidad por parte de la demandante de pagar contribuciones que a lo sumo serían adeudadas por otra persona.[65]

De esta forma, en virtud de que Yiyi Motors claramente nunca figuró como el contribuyente ante la ley, desde el momento en que el Secretario de Hacienda se atribuyó la facultad de imponerle el pago de arbitrios por la diferencia que surge cuando vende un vehículo a un costo mayor que el precio sugerido de venta declarado por el

---

[63] Íd., págs. 658-659.

[64] Íd., pág. 659.

[65] Íd.

importador, el *injunction* constituyó el remedio legal adecuado para impedir la imposición de arbitrios que no le correspondía pagar. Recordemos que la acción que originó la controversia que llega ante nuestra consideración lo es precisamente una demanda de *injunction* mediante la cual el peticionario solicitó, entre otras cosas, que se le ordenara al Secretario de Hacienda que cesara y desistiera de imponerle el pago de arbitrios no autorizados en ley sobre los vehículos importados por Motorambar, contribuciones que, en cualquier caso, debía imponer a éste en calidad de consignatario conforme lo establece el Código de Rentas Internas.

Ante una alegación de tal índole, realizada expresamente en la demanda, y siendo tan claro el hecho de que no había autoridad legal alguna para imponerle contribuciones a Yiyi Motors, se justificaba la aplicación del *injunction* como remedio extraordinario pues, según el peticionario fundamentó sus alegaciones, la letra clara de la ley impedía que se le considerase como el contribuyente. La redacción del articulado del Código de Rentas Internas no crea ninguna duda en cuanto a quién se considera el contribuyente, pues explícitamente dispone que lo es el consignatario de los vehículos de motor importados.

En este sentido, nos corresponde precisar que para casos en que resulta tan claro que el demandante no es el contribuyente, basta con que la demanda de *injunction* contenga alegaciones bien fundamentadas respecto a la irracionabilidad de que se le considere el contribuyente

ante la ley. Sin embargo, de surgirle alguna duda al tribunal, ya sea debido a que dichas alegaciones hayan sido efectivamente controvertidas o porque el estatuto en cuestión no resulta ser lo suficientemente claro, entonces no procede el *injunction* como remedio extraordinario, sino que dicho asunto debe evaluarse mediante el procedimiento ordinario disponible a esos efectos.

En este punto, nos corresponde distinguir lo resuelto en Cafeteros de P.R. v. Tesorero, 74 D.P.R. 752 (1953), de lo establecido en Durlach Bros., Inc. v. Domenech, Tes., *supra*. A diferencia de la situación que presenta el caso de autos —similar a Durlach Bros., Inc. v. Domenech, Tes., *supra*—, en Cafeteros de P.R. v. Tesorero, *supra*, existían serias dudas acerca de si la allí peticionaria del *injunction* podía considerarse como la contribuyente. Las palabras de esta Curia a esos efectos fueron:

> [N]o es enteramente claro que la apelante no sea una contribuyente. Su *status* no se perfila con una claridad meridiana.
>
> ........
>
> De todos modos, basta con decir que la cuestión relativa al *status* de la apelante es debatible, lo cual acentúa más la aplicabilidad a este caso de la doctrina relativa a la improcedencia de los recursos de injunction y de sentencia declaratoria al tener la demandante un remedio adecuado en el curso ordinario de la ley.[66]

Bajo este marco fáctico, y ante la alegación de la entonces demandante en cuanto a que ella no podía ser

---

[66] Cafeteros de P.R. v. Tesorero, 74 D.P.R. 752, 766-767 (1953).

considerada como la contribuyente ante la ley, este

Tribunal se expresó de la siguiente forma:

> [A]un si la apelante puede tener una base
> razonable para su contención de que ella no es
> una contribuyente sujeta al ámbito de la ley, las
> consideraciones de política pública que hemos
> expuesto determinan que esa alegación de la
> apelante debe ser dilucidada en el procedimiento
> ordinario relativo al pago de contribuciones, y
> no en el procedimiento que ha escogido la
> apelante. [...] Desde el punto de vista de la
> equidad, podría argumentarse que sería injusto y
> opresivo el obligar a una persona que claramente
> no es una contribuyente a pagar una contribución
> que ella no adeuda, y que es absolutamente nula,
> y luego obligarla a iniciar un procedimiento de
> reintegro. Pero no podemos olvidar que muchas
> doctrinas jurídicas son resultado de un proceso
> de pesar y aquilatar distintos intereses y
> necesidades individuales y públicas. El interés
> en evitar una inconveniencia individual inmediata
> debe quedar subordinado, en estas situaciones, al
> interés social, de mayor significación, de evitar
> una paralización en las actividades
> gubernamentales. Hemos hablado de una
> inconveniencia individual inmediata, y no
> permanente, ya que la doctrina en discusión
> presume la existencia de un remedio adecuado en
> ley, en el cual las alegaciones de la reclamante
> han de dilucidarse finalmente.[67]

Sin embargo, dicha expresión se realizó en un caso en

el que este Foro se inclinaba a determinar que la

solicitante del *injunction* sí era la contribuyente. Tanto

así, que en la disposición de <u>Cafeteros de P.R. v.</u>

<u>Tesorero</u>, *supra*, se manifestó que la definición

reglamentaria del término "comprador" de café —quien tenía

la condición de contribuyente ante la ley— le era aplicable

a la peticionaria.[68] De igual forma, en el referido caso,

según concluyó esta Curia, la no procedencia del *injunction*

---

[67] <u>Íd</u>., págs. 765-766.
[68] <u>Íd</u>., págs. 766-767.

se debió además a que no se había demostrado que concurriesen circunstancias extraordinarias que justificaran su expedición.[69] Por esta razón, la expresión reseñada a los efectos de que se puede obligar a una persona que claramente no es una contribuyente a pagar una contribución que ella no adeuda, se realizó al margen de la realidad que presentaba Cafeteros de P.R. v. Tesorero, *supra*, pues en éste existían serias dudas en cuanto a la condición como contribuyente de la peticionaria, lo que a su vez limitaba la posibilidad de que concurriesen circunstancias extraordinarias.

Muy distinta situación se presentó en Durlach Bros., Inc. v. Domenech, Tes., *supra*, y se presenta hoy en el recurso ante nuestra consideración. En ambos no existía ni existe la más mínima duda en cuanto a que los solicitantes del *injunction* no eran los contribuyentes. Precisamente, ello de por sí configura una circunstancia extraordinaria. De esta forma, ante la particularidad del caso de autos, no nos vemos obligados por tal expresión realizada dentro de un contexto en el que era debatible la condición de contribuyente de la peticionaria, sino que lo que corresponde es, debido a su similitud, aplicar el precedente judicial de Durlach Bros., Inc. v. Domenech, Tes., *supra*. Por ello, aclaramos que para casos excepcionales como el presente, en el que claramente el demandante no figura como un contribuyente ante la ley y a pesar de ello el Estado insiste en cobrarle un tributo que

---

[69] Íd., pág. 767.

no le es aplicable, se mantiene vigente la doctrina establecida en <u>Durlach Bros., Inc. v. Domenech</u>, *supra*.

De esta forma, si un ciudadano logra demostrar con claridad meridiana que no puede ser considerado como un contribuyente ante el tributo que se le ha impuesto, resulta irrazonable obligarle a tributar para luego hacerle agotar los mecanismos administrativos y judiciales disponibles. Lo contrario implicaría malgastar recursos del Estado para llegar a la misma conclusión que se pudo haber conocido desde el comienzo mediante la utilización del remedio extraordinario del *injunction*: su condición de no contribuyente. Así se evita que los ciudadanos sean sometidos a procedimientos engorrosos de manera innecesaria. Precisamente, para impedir que el Estado especule erróneamente con la tranquilidad y el dinero de nuestro pueblo, este Tribunal ya ha pautado la procedencia del *injunction* en estas circunstancias especiales y excepcionales.

Distinta es la situación en la que el demandante es el contribuyente o existen dudas sobre su condición como tal. Ello no puede considerarse como una circunstancia especialmente extraordinaria. En este tipo de casos no procede un *injunction* para evitar el pago de contribuciones que pueden ser adeudadas, pues es superior el interés del gobierno de obtener aquellos recursos fiscales necesarios para su funcionamiento. En esta situación, el demandante tiene a su alcance la posibilidad de presentar una solicitud de reintegro ante el Departamento de Hacienda.

Recordemos que, tal como se expresó en <u>Cafeteros de P.R. v.</u> <u>Tesorero</u>, *supra*, "[l]a doctrina prohibitoria de *injunctions* al existir un remedio adecuado en ley se basa en el deseo de evitar la paralización de las actividades gubernamentales, en armonía con la protección de los intereses legítimos del **contribuyente** al concederle a éste una oportunidad razonable de hacer valer sus derechos en el remedio ordinario en ley que está a su alcance".[70]

Como hemos visto, está establecido en nuestra jurisprudencia que las cortes tienen jurisdicción para entender en una demanda de *injunction* para impedir el cobro de contribuciones si el demandante aduce un caso claro en cuanto a que éstas no son pagaderas en forma alguna por él. De manera que hoy no nos arrogamos ninguna facultad legislativa, sino que avivamos los pronunciamientos realizados por esta Curia hace muchos años atrás.

En vista de que el caso ante nos es uno de naturaleza extraordinaria, lo que hace inaplicable la prohibición estatutaria a la expedición de *injunctions* para impedir el cobro de contribuciones, analicemos si es aplicable la otra prohibición establecida en la Ley de *Injunction* a los efectos de que ésta impide la concesión de tal remedio extraordinario para evitar la aplicación de una ley o el cumplimiento de una actuación autorizada por una ley, a menos que se hubiera determinado por sentencia final y

---

[70] <u>Íd.</u>, pág. 764 (énfasis suplido).

firme que dicha ley o actuación es inconstitucional o inválida.[71]

En respuesta a la actuación claramente ilegal del Secretario de Hacienda, nos corresponde precisar que anteriormente hemos expresado que el recurso de *injunction* es el remedio adecuado y disponible para que un ciudadano impida que un funcionario, al poner en vigor una legislación, actúe contrario a lo dispuesto en ésta o en exceso de la facultad otorgada por dicho estatuto.[72] Ahora bien, el criterio para determinar si la actuación de un funcionario está comprendida dentro de la autoridad conferida por ley, no consiste en evaluar si la actuación es válida o constitucional según ha sido autorizada por el legislador.[73]

La importancia de lo anterior radica en que, conforme al Código de Enjuiciamiento Civil, los tribunales están impedidos de expedir un *injunction* con el objetivo de examinar la constitucionalidad o validez de la actuación de un funcionario, a menos que se hubiere decretado por sentencia final, firme, inapelable e irrevisable que dicha actuación autorizada por la Asamblea Legislativa es inconstitucional o inválida.[74] En cambio, si lo que se

---

[71] 32 L.P.R.A. sec. 3524(3).

[72] Ortega Cabrera v. Tribunal Superior, 101 D.P.R. 612, 619 (1973).

[73] Las Monjas Racing Corp. v. Com. Hípica, 67 D.P.R. 45, 55 (1947); Nieves v. López, Comisionado, 61 D.P.R. 269, 273 (1943).
[74] Íd.; 32 L.P.R.A. sec. 3524(3).

pretende es determinar si la actuación está comprendida dentro de la autoridad conferida por el estatuto al funcionario, entonces, en ausencia de un remedio adecuado en el curso ordinario de la ley, procede declarar con lugar la solicitud de *injunction*.[75]

Precisamente, debido a que debe existir alguna forma de proteger al público contra la aplicación ilegal de los estatutos por parte de los funcionarios, en ausencia de otro remedio disponible en ley, los tribunales no están impedidos de asumir jurisdicción cuando se presenta una demanda de *injunction* que tiene como objetivo investigar la legalidad de los actos oficiales.[76] "Los actos de todos [los] funcionarios deben estar justificados por alguna ley, y en caso de que un funcionario viole el estatuto en perjuicio de alguna persona, las cortes generalmente tienen jurisdicción para conceder reparación."[77]

En vista de lo anterior, el *injunction* solicitado por Yiyi Motors es el remedio adecuado para impedirle al Secretario de Hacienda que, al poner en vigor el Código de Rentas Internas, actúe contrario a lo dispuesto en éste o en exceso de la facultad conferida por dicho estatuto. En otras palabras, como el Secretario de Hacienda actúa sin

---

[75] Las Monjas Racing Corp. v. Com. Hípica, *supra*, págs. 55-56.

[76] Ortega Cabrera v. Tribunal Superior, *supra*, pág. 618; Las Monjas Racing Corp. v. Com. Hípica, *supra*, págs. 55-56; Nieves v. López, Comisionado, *supra*, pág. 273.

[77] White Star Bus Line Inc. v. Sánchez, 59 D.P.R. 748, 752 (1942)(citando a American School of Magnetic Healing v. McAnnulty, 187 U.S. 94 (1902)).

autoridad legal para ello o excediéndose de ésta, es el *injunction* el mecanismo disponible para que Yiyi Motors proteja su propiedad contra la aplicación ilegal del Código de Rentas Internas por parte de este funcionario.[78]

"Debe tenerse presente que el auto de *injunction* es el brazo enérgico de la justicia para la protección de los ciudadanos contra los desmanes de los funcionarios públicos que actuando so color de autoridad les causan daño irreparable."[79] Ahora bien, el criterio de daño irreparable "tiene que enmarcarse dentro de otro más amplio y flexible que es el que propugna la procedencia del *injunction* siempre que el remedio existente en el curso ordinario de la ley no proteja adecuadamente los derechos sustantivos del peticionario tan pronto, rápido y eficaz, como lo protegería un derecho de los de 'equidad'".[80]

En virtud de lo anterior, de no ser por el recurso extraordinario de *injunction*, Yiyi Motors se vería desprovisto de remedio eficaz alguno para impugnar la actuación ilegal del Secretario de Hacienda y solicitar el cese y desista de ésta. No hay remedio adecuado existente

---

[78] Véase, <u>White Star Bus Line Inc. v. Sánchez</u>, *supra*, pág. 753.

[79] <u>Ortega Cabrera v. Tribunal Superior</u>, *supra*, pág. 618.

[80] D. Rivé Rivera, <u>Recursos Extraordinarios</u>, 2da Ed., Prog. de Educ. Juríd. Cont. de la Facultad de Derecho de la Univ. Interamericana de P.R., 1996, pág. 31. En igual sentido, en <u>Cruz v. Ortiz</u>, 74 D.P.R. 321, 328 (1953), establecimos: "El concepto de evitación de daños irreparables ... constituye un aspecto de la regla básica de que procede un *injunction* cuando el remedio existente en el curso ordinario de la ley es inadecuado".

en el curso ordinario de la ley que Yiyi Motors pueda ejercitar para evitar que, por las actuaciones ilegales de este funcionario, se interrumpan sustancial e incesantemente sus operaciones comerciales, y a su vez impedir que se vean afectados los derechos de los cientos de consumidores que adquirieron vehículos de éste y que no han podido disfrutar de ellos a causa de la negativa del Secretario de Hacienda de emitir una certificación de pago de arbitrios válida.[81]

Téngase en cuenta que el Secretario mantiene la facultad de fiscalizar el pago de contribuciones y determinar si surge alguna deficiencia contributiva mediante el procedimiento formal establecido en la Sec. 6002 del Código de Rentas Internas. Empero, ello no puede realizarlo a merced de afectar los derechos del concesionario y de sus consumidores. En este sentido, debe quedar claro que mediante este dictamen no estamos impidiéndole al Secretario de Hacienda que cobre las contribuciones que en efecto el contribuyente pueda adeudar, sino que lo que se requiere de este funcionario es que actúe dentro del marco de la ley.

---

[81] Es insostenible que las personas que compran los vehículos transcurrido el evento contributivo, y que claramente no tienen responsabilidad tributaria por la importación de éstos, queden desprovistos de remedio hasta tanto el Secretario de Hacienda y el importador diluciden si se adeudan contribuciones a tenor con un sistema tributario ajeno al establecido en el Código de Rentas Internas, lo que a su vez los deja presos de que el importador concerniente –Motorambar en este caso— lo acepte y eventualmente emita el pago requerido.

Por último, como se ha demostrado, el criterio rector para la Opinión que hoy emitimos se basa en interpretar la ley tal cual la Asamblea Legislativa la concibió, la redactó y la aprobó. Sin embargo, no podemos pasar por alto los efectos beneficiosos que ésta acarrea para la industria automotriz y, en consecuencia, para la recuperación de nuestra maltrecha economía.

Como sabemos, la venta de los vehículos de motor ha disminuido considerablemente como consecuencia de la recesión económica. Tanto así, que corporaciones de gran renombre se han visto en la obligación de cesantear un sinnúmero de empleados e incluso algunas de ellas se han fusionado para sobrellevar las pérdidas de capital que han sufrido debido a la poca demanda de parte de los consumidores. Precisamente, para contrarrestar la crisis de la industria automotriz, hasta hace muy poco el Gobierno estadounidense había instrumentado un plan de incentivos monetarios que tenía el objetivo de detener la pérdida estrepitosa que padecían y aún padecen muchas de estas corporaciones que integran la industria de los vehículos de motor.

Dentro de este contexto de desasosiego económico, la determinación que hoy alcanzamos al menos aliviana la crisis en la que están sumergidos los concesionarios del país, pues eliminamos una carga contributiva que les fue impuesta ilegalmente. Y a su vez, al eliminarla, contribuimos, al menos, con que se aminore la crisis de la industria automotriz en Puerto Rico ya que de ahora en

adelante los consumidores no tendrán que pagar, como parte del precio de venta, el arbitrio que por la presente anulamos.

**IX**

Por los fundamentos que anteceden, se revoca la Sentencia emitida por el Tribunal de Apelaciones y se concede el *injunction* solicitado por el peticionario a los efectos de ordenarle al Secretario de Hacienda que cese y desista de utilizar el precio final de venta al consumidor como base fiscal para el cálculo de los arbitrios a pagarse por los vehículos nuevos importados al país. De esta forma, se le instruye a este funcionario que, al determinar el tributo a satisfacerse, se atenga a la base contributiva establecida en el Código de Rentas Internas, esto es, al precio sugerido de venta al consumidor. En consecuencia, una vez fijado el arbitrio conforme al procedimiento estatuido en la Sec. 2011(c) del referido Código, el Secretario de Hacienda está obligado a emitir una certificación de pago de arbitrios válida para la inscripción del automóvil en el Departamento de Transportación y Obras Públicas.

Debido a que la sustitución de la base contributiva por parte del Secretario de Hacienda se ha instrumentado mediante su Reglamento 7437, y en vista de que el texto del Código de Rentas Internas no puede entenderse modificado o suplantado por el reglamentario, decretamos inválidos: el inciso (25)(i) del Art. 2001-1, los incisos (a)(4) y (d) del Art. 2011(a)-4, y el Art. 2011(c)(3)-5 de

dicho Reglamento. Además, se le ordena a este funcionario que armonice las restantes disposiciones del Reglamento 7437 conforme a lo aquí expuesto.

Se dictará Sentencia de conformidad.


                                    Erick V. Kolthoff Caraballo
                                         Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Yiyi Motors, Inc.

    Peticionario

        v.

                            CC-2004-675        Certiorari

Estado Libre Asociado de
Puerto Rico, Secretario de
Hacienda y Secretario de
Transportación y Obras
Públicas

    Recurridos

SENTENCIA

San Juan, Puerto Rico, a 14 de octubre de 2009.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente, se revoca la Sentencia emitida por el Tribunal de Apelaciones y se concede el *injunction* solicitado por el peticionario a los efectos de ordenarle al Secretario de Hacienda que cese y desista de utilizar el precio final de venta al consumidor como base fiscal para el cálculo de los arbitrios a pagarse por los vehículos nuevos importados al país. De esta forma, se le instruye a este funcionario que, al determinar el tributo a satisfacerse, se atenga a la base contributiva establecida en el Código de Rentas Internas, esto es, al precio sugerido de venta al consumidor. En consecuencia, una vez fijado el arbitrio conforme al procedimiento estatuido en la Sec. 2011(c) del referido Código, el Secretario de Hacienda está obligado a emitir una certificación de pago de arbitrios válida para la inscripción del automóvil en el Departamento de Transportación y Obras Públicas.

Debido a que la sustitución de la base contributiva por parte del Secretario de Hacienda se ha instrumentado mediante su Reglamento 7437, y en vista de que el texto del Código de Rentas

Internas no puede entenderse modificado o suplantado por el reglamentario, decretamos inválidos: el inciso (25)(i) del Art. 2001-1, los incisos (a)(4) y (d) del Art. 2011(a)-4, y el Art. 2011(c)(3)-5 de dicho Reglamento. Además, se le ordena a este funcionario que armonice las restantes disposiciones del Reglamento 7437 conforme a lo aquí expuesto.

Así lo pronunció y manda el Tribunal y certifica la Secretaria del Tribunal Supremo Interina. El Juez Asociado señor Martínez Torres emitió Opinión de Conformidad a la cual se une la Jueza Asociada señora Pabón Charneco. El Juez Presidente señor Hernández Denton emitió Opinión Disidente a la cual se une la Juez Asociada señora Rodríguez Rodríguez. La Jueza Asociada señora Fiol Matta emitió Opinión Disidente.


                    Juliana Mosquera Soler
              Secretaria del Tribunal Supremo Interina

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


Yiyi Motors, Inc.

      Peticionaria


        v.

Estado Libre Asociado de       CC-2004-675
Puerto Rico, Secretario de
Hacienda y Secretario de
Transportación y Obras
Públicas

      Recurridos


Opinión de Conformidad emitida por el Juez Asociado señor MARTÍNEZ TORRES, a la cual se une la Jueza Asociada señora PABÓN CHARNECO


En San Juan, Puerto Rico, a 14 de octubre de 2009.


El Juez Presidente señor HERNÁNDEZ DENTON señala que se ve obligado a disentir "nuevamente". Opinión disidente, pág. 2. Se refiere, sin duda, a las opiniones disidentes que ha emitido en los últimos meses. El hilo conductor entre estas opiniones disidentes es que para el señor Juez Presidente, muchas de las decisiones del Tribunal que él preside son actos de "legislación judicial"[82], un "retroceso histórico"[83], "activismo judicial"[84], y un "huracán de cuyo

---

[82] Id., pág. 1.

[83] Id., págs. 2 y 7; Pueblo v. Díaz, Bonano, res. en 27 de agosto de 2009, 2009 T.S.P.R. 138 pág. 35, 2009 J.T.S. ___, 176 D.P.R. ___ (2009) (Opinión disidente); Crespo Quiñones v. Santiago Velázquez, res. en 31 de julio de 2009, 2009

embate nuestro pueblo tardará mucho tiempo en reponerse".[85] A este popurrí de adjetivos, el señor Juez Presidente ha añadido que varias decisiones de este Tribunal son "tecnicismos procesales"[86], o un "mero ritualismo procesal"[87] que "responde más al automatismo y a la miopía judicial que a la precisión jurídica"[88], o que responden a una "concepción formalista"[89], producto de un "salto lógico"[90], a un "raciocinio reduccionista", es decir un "razonamiento autómata"[91], o "un raciocinio que nos recuerda las distopías ficticias de George Orwell y la represión policíaca de los regímenes totalitarios de la historia moderna".[92] Para una repetición de todo lo anterior, véase la Opinión disidente del Juez Presidente señor HERNÁNDEZ DENTON, a la cual se une la Juez Asociada señora RODRÍGUEZ

---

T.S.P.R. 125, 2009 J.T.S. 128 págs. 8 y 16, 176 D.P.R. ___ (2009) (Opinión disidente).

[84] Suárez Cáceres v. Com. Estatal de Elecciones, res. en 9 de junio de 2009, 2009 T.S.P.R. 64, 2009 J.T.S. 100 pág. 929, 176 D.P.R. ___ (2009) (Opinión disidente).

[85] Suárez Cáceres v. Com. Estatal de Elecciones, id., 2009 J.T.S. 100 pág. 936.

[86] Crespo Quiñones v. Santiago Velázquez, supra, 2009 J.T.S. 128 pág. 16. Véase, además, Pueblo v. Díaz De León, res. en 16 de septiembre de 2009, 2009 T.S.P.R. 142 págs. 17 y 33, 2009 J.T.S. ___, 176 D.P.R. ___ (2009) (Opinión disidente).

[87] Pueblo v. Díaz De León, id., pág. 36.

[88] Crespo Quiñones v. Santiago Velázquez, supra, 2009 J.T.S. 128 pág. 10.

[89] Id., pág. 34.

[90] Pueblo v. Díaz, Bonano, supra, pág. 27.

[91] Id., pág. 31.

[92] Id., pág. 35.

RODRÍGUEZ, págs. 1-2. Finalmente, el señor Juez Presidente ha manifestado que "la mayoría parece desconocer el alcance de nuestras facultades como máximo y último Foro de nuestro país".[93]

Por supuesto, la caricatura grotesca que se quiere pintar con estas frases no corresponde a la realidad de lo que ha resuelto este Tribunal. En verdad estamos ante dos visiones distintas de la función de la Rama Judicial y en particular, de este Tribunal. Que quede claro que el señor Juez Presidente tiene el derecho de discrepar de la visión mayoritaria. Soy el primero en defender ese derecho y más aun, el derecho incuestionable del señor Juez Presidente a expresar esa disidencia de la forma y en el momento que él lo entienda necesario. Después de todo, la disidencia fuerte y vigorosa es saludable para el desarrollo del derecho en un foro colegiado como éste.

Sin embargo, eso no significa que yo deba permanecer callado. Precisamente porque conozco el alcance de mis facultades como integrante de este Tribunal, me veo igualmente obligado a responder de manera respetuosa y firme, al empleo más reciente de la hipérbole y las visiones apocalípticas para demonizar, caricaturizar y deformar las decisiones de este Tribunal con los argumentos ficticios que postulan que este Tribunal resuelve de espaldas al derecho y en contra de nuestro Pueblo. Infundir

---

[93] Crespo Quiñones v. Santiago Velázquez, supra, 2009 J.T.S. 128 pág. 16.

esos miedos no es gracioso, ni siquiera ante la cercanía del Día de *Halloween*.

La independencia judicial no está en juego aquí. Es tiempo que aceptemos que el cambio en visión y filosofía jurídica por el que atraviesa este Tribunal no significa el fin del mundo ni la hecatombe jurídica. Se trata del flujo normal de la marea judicial en una democracia, producto indirecto del mandato del Pueblo expresado donde corresponde, en las urnas. Ese es nuestro sistema constitucional. Desmerecer ese proceso democrático no le hace bien a Puerto Rico.

Desafortunadamente, este llamado a la cordura y a poner las cosas en su justa perspectiva ha caído en oídos sordos en este Tribunal. Se reclama tolerancia al disenso pero se le niega la misma tolerancia a las decisiones del Tribunal. En su lugar, se deforma el alcance y la intención de decisiones como la que hoy emitimos, repitiendo el miedo, la tergiversación y la caricatura, para amedrentar al Pueblo al que servimos. Eso no honra la toga. Por el contrario, la desmerece.

Lo que incomoda no es la disidencia, sino el patrón de demonizar al Tribunal. Eso me produce una gran desilusión, como la que sintió y expresó Tarrou cuando escuchó por primera vez a la persona que tanto admiraba —su padre— abogar como fiscal por la pena capital para un convicto: "Transfigurado por la toga roja, ni bonachón ni afectuoso, bullían en su boca las frases enormes que sin cesar salían

de ella, como culebras". A. Camus, La peste, 21$^{ra}$ ed.,
Buenos Aires, Argentina, Editorial Sur, S.A., 1981, pág.
194.

Ahora es inevitable atender el incidente más reciente
para asustar al Pueblo, al imputarse que la decisión de
este tribunal "tiene el potencial de descalabrar el sistema
contributivo del país". Opinión disidente del Juez
Presidente señor HERNÁNDEZ DENTON, a la cual se une la Juez
Asociada señora RODRÍGUEZ RODRÍGUEZ, pág. 2. La Opinión
disidente aduce equivocadamente que la peticionaria Yiyi
Motors, Inc., no tiene disponible el mecanismo de
injunction para que el Secretario de Hacienda cese y
desista de una práctica administrativa que le impide a Yiyi
Motors inscribir en el registro del Departamento de
Transportación y Obras Públicas los automóviles ya
vendidos. Esa inscripción es indispensable para que Yiyi
Motors pueda entregar a sus clientes los títulos de
propiedad correspondientes. El Secretario de Hacienda
insiste en no emitir una certificación de pago de arbitrios
de dichos vehículos. Mientras eso no se haga, miles de
ciudadanos carecen de un título inscrito sobre sus
automóviles, y por consiguiente, Yiyi Motors se ve
imposibilitada de cumplir con su obligación como vendedora
de otorgar un título válido y completo a sus clientes.

Es correcto que en Puerto Rico se prohíbe que un
contribuyente obtenga el remedio extraordinario de
injunction "[p]ara impedir la imposición o cobro de

cualquier contribución establecida por las leyes de los Estados Unidos o de Puerto Rico". Art. 678(7) del Código de Enjuiciamiento Civil de 1933, según enmendado, hoy conocido como Ley de Recursos Extraordinarios, 32 L.P.R.A. sec. 3524(7). El propósito de esta prohibición es subordinar el interés individual de evitar una inconveniencia inmediata al interés social de evitar una paralización de las actividades gubernamentales. Cafeteros de Puerto Rico v. Tesorero, 74 D.P.R. 752 (1953). La alegación de que el demandante no es un contribuyente según la ley o que el tributo es ilegal, sin más, no es suficiente para justificar una demanda de *injunction* de contribuyente. Id., pág. 765; D. Rivé Rivera, Recursos extraordinarios, 2da ed., San Juan, Ed. Prog. Educ. Cont. UIPR, 1996, pág. 67. En esos casos, el procedimiento de pago y solicitud de reintegro de contribuciones pagadas ilegalmente se considera adecuado. Descartes, Tesorero v. Tribunal de Contribuciones, 73 D.P.R. 295 (1942). La única excepción bajo la cual se permite el *injunction* para evitar el cobro de un tributo es que el contribuyente demuestre:

(1) Que la contribución es claramente ilegal, Fernández v. Buscaglia, Tesorero, 60 D.P.R. 596 (1942);

(2) Que las leyes contributivas no le garantizan un reintegro adecuado de lo pagado si finalmente prevalece; y

(3) Como en todo recurso de *injunction*, que la imposición o cobro del tributo le causarán daño irreparable. <u>Cafeteros de Puerto Rico v. Tesorero</u>, <u>supra</u>, págs. 761-766.

Aun así, el señor Juez Presidente arguye que esta excepción ha sido criticada y es un acto de "legislación judicial", la frase de moda. Contrario a lo que señala la Opinión disidente, lejos de criticar esa excepción, tanto el tratadista Rivé Rivera como la jurisprudencia de este Tribunal la han reconocido de manera reiterada y uniforme.

Respetuosamente entiendo que el señor Juez Presidente se equivoca al querer encajar este caso dentro de un marco tan estrecho. No se trata de que la excepción sea contraria al texto de la ley. Es que la prohibición al pleito de *injunction* no aplica a este recurso.

Por definición, la prohibición al uso del *injunction* está dirigida al contribuyente afectado, es decir, a la persona que viene obligada a pagar el tributo. Esto es lógico, pues el contribuyente tiene disponibles otros mecanismos en ley para librarse del pago del tributo.

A diferencia del contribuyente, la persona que no tiene que pagar el tributo, es decir, que no es el contribuyente, pero que se ve afectada colateralmente por la deficiencia contributiva, puede instar el recurso extraordinario de *injunction* para evitar los daños irreparables que le causa la imposición del arbitrio. No se puede alegar que esa persona tiene disponible el remedio de

pagar bajo protesta y solicitar reintegro porque ese mecanismo "es aplicable únicamente a personas que están sujetas al pago de contribuciones según las leyes de Puerto Rico". Durlach Bros., Inc. v. Domenech, Tes., 47 D.P.R. 654, 659 (1934).

En este caso, Yiyi Motors no tiene disponible el mecanismo de pago bajo protesta porque no es la persona jurídica que viene obligada a pagar la contribución adicional que impuso el Secretario de Hacienda. En otras palabras, "las contribuciones no son debidas por la peticionaria en este caso, sino por otra persona". Id., pág. 657.

Esto no es una mera alegación de Yiyi Motors ni un invento de este Tribunal. Es el estado de derecho producto de la determinación del Tribunal de Primera Instancia de que el Secretario de Hacienda no le ha requerido a Yiyi Motors el pago del arbitrio adicional en controversia porque Yiyi Motors no es el obligado por ley a tributar. El Secretario no ha requerido ese pago porque sabe que, por ley, esa obligación es del traficante o importador de vehículos, que en este caso es Motorambar, Inc.

Quien único parece cuestionar esto en esta etapa del procedimiento judicial es la disidencia. El Secretario de Hacienda no ha impugnado, no ha cuestionado ni ha recurrido de esa determinación del foro primario. Además, el peticionario ante los foros apelativos ha sido Yiyi Motors. No nos corresponde asumir la postura que el Secretario de

Hacienda declinó y abogar por lo que éste no implora. Hacerlo sería abrogarnos una facultad de la Rama Ejecutiva y convertirnos en abogado de parte.

Establecido en el récord que Yiyi Motors no es el contribuyente y que no tiene a su disposición el mecanismo de pago bajo protesta, es claro que no le podemos dejar desprovista de remedio. La parte peticionaria, Yiyi Motors, no está evadiendo el pago de impuestos. Por el contrario, Yiyi Motors se encuentra, bajo el estado procesal vigente, a expensas de lo que decidan Motorambar y el Departamento de Hacienda. Yiyi Motors no es parte en ese proceso de cobro, como dispuso el Tribunal de Primera Instancia, y por tanto no puede defender su posición en el foro administrativo ni en la revisión judicial de Novo que la ley le provee al contribuyente. Mientras tanto, los vehículos que Yiyi Motors vendió se encuentran sin registrar en el Departamento de Obras Públicas. Eso no se corregirá hasta que el Secretario de Hacienda emita las certificaciones de pago de los arbitrios, lo que tampoco sucederá hasta que Motorambar decida pagar o impugnar la imposición contributiva. Eso se repetirá cada vez que Yiyi Motors venda un automóvil y el Secretario de Hacienda notifique a Motorambar una deficiencia contributiva. Mientras tanto, Yiyi Motors está vulnerable ante las posibles reclamaciones de los compradores, molestos porque no han logrado inscribir a su nombre el auto que Yiyi

Motors les vendió. El único remedio que Yiyi Motors tiene para remediar esta encrucijada es el *injunction*.

Las Opiniones disidentes no reconocen este problema y por eso no lo atienden. Se limitan a invocar la inaplicable prohibición al *injunction* del contribuyente. El señor Juez Presidente invoca también el efecto que él cree que la Opinión del Tribunal puede tener sobre el erario. El problema con esa Opinión disidente, aparte de su incorrección en derecho, es que si el problema se redujera a eso, bastaría con que Yiyi Motors pagara bajo protesta y pidiera reintegro si el Secretario de Hacienda le intentara cobrar una contribución adicional por la diferencia entre el precio sugerido de venta y el precio real de venta de uno o más automóviles. Cuando eso sucediera y Yiyi Motors impugnara la contribución, tendríamos que resolver que ésta es ilegal. El efecto sobre las finanzas del Gobierno no sería entonces un argumento para resolver en contra de Yiyi Motors ni de ningún contribuyente a quien se le pretenda cobrar un arbitrio ilegal. Tampoco es buen argumento ahora.

Por esa razón me preocupa sobremanera que se diga que el Tribunal incurre en un "contrasentido" al resolver a favor de un contribuyente mientras "[e]stamos atravesando por una época de crisis fiscal sin precedentes, en la que los recursos del Estado son cada vez menos y, como consecuencia de ello, se han realizado ajustes diversos y severos en el gobierno". Opinión disidente del Juez

Presidente señor HERNÁNDEZ DENTON, a la cual se unió la Juez Asociada señora RODRÍGUEZ RODRÍGUEZ, pág. 10.

Si el impacto económico fuera el criterio rector para decidir este recurso, cabría plantearse que la solución alcanzada ayuda a aliviar la crisis de la industria de ventas de automóviles en Puerto Rico, al eliminarle a los concesionarios la carga de un arbitrio adicional sobre el precio de los vehículos de motor que éstos apenas logran vender en medio de una recesión económica. Es conocido por todos que la industria de venta de autos se encuentra afectada por la recesión actual, al punto que el Gobierno federal se vio compelido a implantar por tiempo limitado un plan de incentivos monetarios para aumentar las anémicas ventas de automóviles en toda la Nación, incluyendo a Puerto Rico. En ese clima económico, la decisión de este Tribunal contribuye, por lo menos, a evitar que los concesionarios tengan que subir los precios de venta para pagar el arbitrio que hoy declaramos ilegal.

Como vemos, la moneda tiene dos caras. Por eso, el criterio para nuestra decisión no puede ser la crisis económica actual. "No es atendible en este foro el argumento... sobre el impacto oneroso que tiene el estatuto.... Nuestra función es interpretar la ley y no juzgar su bondad o sabiduría". Famania v. Corp. Azucarera de P.R., 113 D.P.R. 654, 657-658 (1982), citado en Mun. Trujillo Alto v. Cable TV, 132 D.P.R. 1008, 1019 (1993). No hay duda que al resolver, los jueces tenemos que sopesar

las consecuencias de nuestras decisiones para las partes y la sociedad en general. "Como jueces, debemos ser conscientes de que todas nuestras decisiones tienen consecuencias, no sólo para las partes, sino para la sociedad misma en la que nos desenvolvemos." Pueblo v. Díaz De León, supra, 2009 T.S.P.R. 142 pág. 36 (Opinión disidente del Juez Presidente señor HERNÁNDEZ DENTON, a la cual se unió la Jueza Asociada señora FIOL MATTA). Pero en todo caso, nuestras decisiones tienen que basarse en el derecho aplicable y no en consideraciones ajenas al dictado de una conciencia independiente. Incluso, hemos de excluir hasta la posible apariencia de que nuestras actuaciones judiciales están influenciadas por el clamor público, o por consideraciones de popularidad o notoriedad. Canon 8 de Ética Judicial, 4 L.P.R.A. Ap. IV-B C. 8. Es la Asamblea Legislativa "la que luego de considerar todos los factores envueltos incluyendo el impacto económico,..." decidirá si enmienda o no la ley de arbitrios. Torres García v. F.S.E., 111 D.P.R. 469, 474 (1981), citado en Mun. Trujillo Alto v. Cable TV, supra.

Por supuesto, somos conscientes de la magnitud de los problemas fiscales del Gobierno. Sin embargo, tenemos bien claro que la solución a la crisis fiscal no puede ser que el Gobierno cobre arbitrios en contra de la ley. Este Tribunal está para hacer justicia y procurar que todos cumplan la ley, incluyendo el Gobierno. Somos el más alto

Tribunal para hacer justicia en esta jurisdicción y no una colecturía del Departamento de Hacienda.


RAFAEL L. MARTÍNEZ TORRES

Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Yiyi Motors, Inc.

    Peticionaria

        v.

Estado Libre Asociado
de Puerto Rico, Secretario        CC-2004-675     *Certiorari*
de Hacienda y Secretario de
Transportación y Obras Públicas

    Recurrido

Opinión Disidente emitida por el Juez Presidente SEÑOR HERNÁNDEZ DENTON, a la cual se une la Juez Asociada SEÑORA RODRÍGUEZ RODRÍGUEZ

San Juan, Puerto Rico, a 14 de octubre de 2009.

> "*[A]unque pusieron silencio a las lenguas, no le pudieron poner a las plumas, las cuales, con más libertad que las lenguas, suelen dar a entender [al pueblo] lo que en el alma está encerrado*".
>
> –Miguel de Cervantes, <u>Don Quijote de la Mancha</u>, Parte I, Cap. XXIV.

Durante los últimos meses, a través de la disidencia **firme, pero respetuosa**, le hemos hecho saber a nuestro país que muchas de las decisiones que este Tribunal ha emitido constituyen actos de "*legislación judicial*",[94] de "*retroceso histórico*",[95]

---

[94] Véase, *post*, pág. 7.

[95] Íd. págs. 2 y 7; <u>Pueblo v. Díaz, Bonano</u>, res. el 27 de agosto de 2009, 2009 T.S.P.R. 138, pág. 35 (Op. disidente).

de meros *"ritualismos procesales"* que *"responden más al automatismo y a la miopía judicial que a la precisión jurídica"*,[96] de *"una concepción formalista"*,[97] de un *"razonamiento autómata"*[98] o de *"un raciocinio que nos recuerda las distopías ficticias de George Orwell y la represión policiaca de los regímenes totalitarios de la historia moderna"*.[99] En fin, *"un huracán de cuyo embate nuestro pueblo tardará mucho tiempo en reponerse"*.[100]

Pensábamos que nuestro llamado haría eco en la conciencia de la mayoría de este Tribunal. Lamentablemente, ello no ha sido así. En el día de hoy, nuevamente nos vemos obligados a honrar nuestro juramento para señalar que la Opinión emitida en el caso de autos modifica la naturaleza del recurso de *injunction* y *"tiene el potencial de descalabrar el sistema contributivo del país"*. Como sentencia un conocido refrán popular: *"la verdad, aunque severa, es amiga verdadera"*.

Los que estamos en un foro colegiado, como lo es el Tribunal Supremo de Puerto Rico, tenemos que tolerar las voces disidentes, aunque en ocasiones nos incomoden. Al

---

[96] Véanse <u>Pueblo v. Díaz de León</u>, res. el 16 de septiembre de 2009, 2009 T.S.P.R. 142, págs. 17 y 33 (Op. Disidente); <u>Crespo Quiñones v. Santiago Velázquez</u>, res. el 31 de julio de 2009, 2009 T.S.P.R. 125, págs. 8 y 16 (Op. disidente).

[97] <u>Crespo Quiñones v. Santiago Velázquez</u>, *supra*, pág. 34.

[98] <u>Pueblo v. Díaz, Bonano</u>, *supra*, pág. 35.

[99] Íd. pág. 31.

[100] <u>Suárez Cáceres v. C.E.E.</u>, res. el 9 de junio de 2009, 2009 T.S.P.R. 64.

adjudicar las controversias ante nuestra consideración, sin duda alguna, cada uno de nosotros tiene una responsabilidad constitucional ante el país. Esa responsabilidad exige que al descargar nuestra función de juzgar una controversia, lo hagamos **conforme a Derecho**. Si entendemos que en un caso en particular el criterio mayoritario se aparta de esa máxima judicial, así debemos expresarlo todas las veces que sean necesarias y de la forma que estimemos más adecuada para que el país conozca nuestro parecer. Disentir es, pues, un acto inherente a la naturaleza de nuestro rol como jueces. Basta con examinar el legado de todos los que impartieron justicia desde este estrado apelativo para darnos cuenta de que, al disentir enérgicamente y a base de los fundamentos adecuados, enriquecemos nuestra tradición jurídica.

Ese legado también nos ha enseñado que el Estado de Derecho en un sistema democrático como el nuestro no puede ni debe estar sujeto al vaivén de los procesos electorales. Aquellos que vestimos la toga debemos regirnos por este principio tan fundamental que, en esencia, es el pilar de la independencia judicial. Oportunamente, la historia sabrá juzgarnos.

I.

En momentos en que el Estado se enfrenta a una crisis fiscal sin precedentes, una mayoría de este Tribunal decide enmendar la Ley de *Injunction* para permitir que un concesionario de autos impugne la facultad del Secretario

de Hacienda para cobrar la diferencia en arbitrios surgida a raíz de un cambio en el "precio sugerido de venta al consumidor", que es la base contributiva según la cual se paga dicho tributo al introducirse los vehículos de motor al país. Por entender que esta decisión es contraria al espíritu y a la letra de la Ley de *Injunction* y que, en el proceso, se arroga de las facultades constitucionales de la Asamblea Legislativa, nuevamente nos vemos obligados a disentir. No podemos suscribir una Opinión que le propina una estocada fatal a los esfuerzos legítimos del Departamento de Hacienda para combatir **un posible esquema de evasión contributiva** y velar por que se cumpla con el pago de los impuestos que se le deben al erario.

En este caso, Yiyi Motors, Inc. —concesionario de los vehículos de motor marca Nissan— presentó en el Tribunal de Primera Instancia, Sala Superior de San Juan, una "Demanda y solicitud de *injunction*". Según se desprende de la faz de dicho documento, **la empresa solicitó una orden provisional de *injunction* y una orden permanente para que, entre otras cosas, el Secretario de Hacienda cesara y desistiera de**: (1) sustituir ilegalmente la base fiscal establecida en el Código de Rentas Internas para el pago de arbitrios de vehículos de motor; (2) imponer el pago de arbitrios al concesionario, y no al consignatario, conforme establece el Código de Rentas Internas, y (3) imponer contribuciones ilegales sobre el pago de arbitrios a vehículos importados.

En su recurso, Yiyi Motors cuestionó la autoridad del Secretario de Hacienda para verificar las transacciones de venta realizadas por los concesionarios, con el propósito de detectar variaciones en el "precio sugerido de venta al consumidor", base contributiva según la cual se computa el pago de arbitrios por la importación de automóviles. Según la empresa, esta iniciativa de fiscalización le causó daños irreparables, ya que el Departamento de Hacienda se negó a expedirle el recibo de pago necesario para inscribir los vehículos de motor que vendió a sus clientes. Esto, pues Yiyi Motors no pagó la diferencia en arbitrios surgida a raíz de que el precio por el cual vendió tales unidades era mayor al que se había informado al Secretario de Hacienda.

Aun cuando la demanda no contiene una causa de acción, pues se limita a esbozar las razones por las cuales se debe conceder el recurso de *injunction* solicitado, la Opinión del Tribunal la utiliza para resolver que el Secretario de Hacienda no puede fiscalizar el pago de arbitrios por la importación de automóviles *luego* de realizado el pago correspondiente. Según colige el Tribunal, la autoridad del Secretario de Hacienda para constatar que los importadores de automóviles y sus concesionarios cumplan con el pago del referido arbitrio, se limita a revisar la razonabilidad del "precio sugerido de venta al consumidor" informado al momento de introducirse los vehículos al país. Por ende, y en vista de su conclusión sobre los méritos del caso, este Foro

resuelve que el recurso extraordinario de *injunction* es el adecuado para atender el reclamo de la empresa.

Ahí, precisamente, radica nuestra diferencia con la Opinión del Tribunal. Desde principios del siglo XX en nuestro ordenamiento está vedado utilizar el recurso de *injunction* -remedio proveniente de la equidad anglosajona- para impedir la imposición o el cobro de cualquier contribución establecida por las leyes de los Estados Unidos o de Puerto Rico. Véase Art. 678 del Código de Enjuiciamiento Civil de 1933, 32 L.P.R.A. sec. 3524(7).

Es conocido que este principio es producto mismo de la naturaleza del remedio de *injunction* y que, además, se basa en hondas consideraciones de política pública y de ordenada administración del gobierno. De hecho, la importancia de este precepto y de la norma estatutaria en el que ha sido consagrado, nos requiere pasar por alto cualquier disputa en cuanto a si el demandante es un contribuyente sujeto al ámbito de la ley, así como en cuanto a la legalidad de una contribución. Sencillamente, tales argumentos no se pueden considerar en un procedimiento de *injunction*. Véase D. Rivé Rivera, <u>Recursos Extraordinarios</u>, 2da ed., 1996, San Juan, Ed. Prog. Educ. Cont. UIPR, pág. 67.

A tales efectos, en <u>Cafeteros de PR v. Tesorero</u>, 74 D.P.R. 752, 764-65 (1953), expresamos:

La regla… (primero es pagar antes que litigar), está sólidamente basada en una política general inspirada **en la**

**protección de intereses sociales de mayor validez y significación que el interés individual transitorio en rehuir el pago inmediato de una contribución.** El gobierno no debe ser obstruido en el ejercicio de sus funciones. La doctrina prohibitoria de *injunctions* al existir un remedio adecuado en ley se basa en el deseo de evitar la paralización de las actividades gubernamentales, en armonía con la protección de intereses legítimos del contribuyente al concederle a éste una oportunidad razonable de hacer valer sus derechos en el remedio ordinario en ley que está a su alcance.

…

Desde el punto de vista de la equidad, podría argumentarse que sería injusto y opresivo obligar a una persona que claramente no es una contribuyente a pagar una contribución que ella no adeuda, y que es absolutamente nula, y luego obligarla a iniciar un procedimiento de reintegro. **Pero no podemos olvidar que muchas doctrinas jurídicas son resultado de un proceso de pesar y aquilatar distintos intereses y necesidades individuales y públicas. El interés en evitar una inconveniencia inmediata debe quedar subordinado, en estas situaciones, al interés social, de mayor significación, de evitar una paralización en las actividades gubernamentales.** (Énfasis nuestro).

Es evidente, pues, que permitir que un litigante cuestione la imposición de una contribución mediante un *injunction* no sólo lesionaría intereses sociales de la más alta jerarquía, sino que presentaría el riesgo de que se paralicen los esfuerzos del gobierno para recaudar fondos. Es decir, la utilización del recurso de *injunction* en tal contexto tiene el potencial de descalabrar el sistema contributivo del país. En efecto, la única excepción a esta doctrina –inaplicable en el caso ante nos– existe sólo para amparar a los demandantes que carezcan totalmente de un remedio adecuado en ley y que presenten circunstancias especialmente extraordinarias que exijan

recurrir al remedio coercitivo del *injunction*. Dicha excepción, sin embargo, no está libre de críticas, pues se ha argumentado que como no se basa en el texto de la Ley de *Injunction*, ésta bien podría ser producto de un acto de "legislación judicial". Véanse Cafeteros de PR v. Tesorero, *supra*, pág. 767 n.5; The Texas Company v. Domenech, 50 D.P.R. 432 (1936); Rivé Rivera, *supra*, pág. 67.

A pesar de la claridad de la normativa reseñada, la cual es producto de un mandato legislativo expreso, la Opinión del Tribunal decide emitir un *injunction* contra el Secretario de Hacienda para precisamente impedir el cobro de contribuciones que, según Yiyi Motors, son ilegales. **No podemos suscribir la postura asumida por el Tribunal, pues consideramos que ésta afectará la marcha ordenada del gobierno y, contrario al mandato del Legislador, abrirá las puertas al uso del *injunction* para cuestionar el cobro de contribuciones a pesar de que existen mecanismos legales adecuados para hacerlo.** En esencia, la Opinión del Tribunal enmienda la Ley de *Injunction* y, al así decidir, se arroga una facultad claramente legislativa.

Más aún, la decisión que emite en el día de hoy una mayoría de los integrantes de este Foro, pasa por alto tres deficiencias fundamentales que aquejan al recurso instado por Yiyi Motors. En primer lugar, no existe tal cosa como un "caso de *injunction*", un "caso de embargo" o un "caso de sindicatura". El recurso de *injunction* no es

más que un remedio provisional, o permanente, para hacer efectivo el derecho sustantivo que se ejercite en la demanda principal. Rivé Rivera, *supra*, pág. 45. No obstante, en este caso, una lectura de la "demanda" que la empresa presentó ante el tribunal de instancia revela, en efecto, que lo único que solicitó fue el remedio extraordinario de *injunction*.

Además, como hemos visto, no importa si una persona puede probar que ha sufrido daños irreparables a raíz de la imposición o el cobro de una contribución. La norma que prohíbe la expedición de *injunctions* para restringir tales acciones fiscales está diseñada, precisamente, para limitar la emisión de órdenes de esa naturaleza aun si se prueba la existencia de los referidos daños. Es decir, los méritos del caso son impertinentes para efectos de tal prohibición.

Por último, incluso si partiéramos de la premisa de que en este caso podría emitirse un *injunction* para limitar las facultades fiscales del Departamento de Hacienda, de una simple lectura del expediente ante nos se desprende que Yiyi Motors no probó que ha sufrido daño irreparable alguno o que carece de un remedio adecuado en ley. En ese sentido, según ha argumentado el Estado a través de todo el proceso judicial seguido en el caso de autos, la empresa conoce de otros remedios para impugnar el cobro de los arbitrios en controversia. En efecto, en agosto de 2001, el Departamento de Hacienda le notificó a

Yiyi Motors una deficiencia de $755,299.82 en arbitrios y la empresa la impugnó mediante un recurso de revisión presentado ante el Tribunal de Primera Instancia, Sala Superior de San Juan, en el caso civil núm. KCO-2001-0027.

No obstante todo lo anterior, la Opinión del Tribunal concluye que en casos como éste "no es necesario probar daños irreparables más allá de los alegados de manera general en la demanda". Op. del Tribunal, *ante*, pág. 49. Es sorprendente la citada aseveración, pues la existencia de daños irreparables constituye el requisito de umbral para la concesión de un *injunction* como el solicitado por Yiyi Motors. El Tribunal, sin embargo, revive jurisprudencia que abandonamos décadas atrás para validar su razonamiento. Véase <u>Durlach Bros. Inc. v. Domenech</u>, 47 D.P.R. 654, 659 (1934). Con ello, este Tribunal demuestra que en lugar de interpretar nuestro Derecho a tono con las realidades de la época revive una doctrina de un tiempo ya superado. Ello, a pesar de la existencia de una prohibición tan taxativa como la impuesta por la Ley de *Injunction*.

Por consiguiente, en este caso Yiyi Motors primero debió pagar el arbitrio que a su entender era ilegal y, luego, debió radicar una solicitud de reintegro ante el Departamento de Hacienda. En vista de que ese no fue el curso de acción seguido por dicha empresa, y en atención a los principios antes reseñados, denegaríamos el recurso

extraordinario de *injunction* solicitado por Yiyi Motors y confirmaríamos la sentencia del Tribunal de Apelaciones.

## II.

Ahora bien, como el Tribunal decide considerar los méritos de la controversia en este caso, no podemos –en conciencia– dejar de expresar nuestro criterio al respecto.

Estamos atravesando por una época de crisis fiscal sin precedentes, en la que los recursos del Estado son cada vez menos y, como resultado, se han realizado ajustes diversos y severos en el gobierno. En vista de ello, nos parece un contrasentido que este Tribunal resuelva que el Secretario de Hacienda está impedido de fiscalizar el pago de arbitrios sobre la venta de vehículos de motor, *luego* de que éstos se importen al país, para allegar más recursos al erario. Esta conclusión, a nuestro juicio, dificulta aún más la tarea de detectar la evasión contributiva y da marcha atrás a los esfuerzos que desde hace más de quince años ha realizado el Departamento de Hacienda para asegurarse que se cobren los arbitrios correspondientes. La Opinión del Tribunal contraviene la intención legislativa de la Ley de Arbitrios sobre Vehículos de Motor, Ley Núm. 80 de 17 de octubre de 1992, 13 LPRA sec. 9.001 *et seq*. Es por ello que, sobre este

particular, coincidimos con el análisis expuesto en la Opinión disidente de la Jueza Asociada señora Fiol Matta.

En fin, por entender que en las circunstancias del caso de autos no se puede utilizar el *injunction* para impedir el cobro de una contribución –aun cuando se alegue que ésta es ilegal–, y por considerar que el resultado al que llega la Opinión del Tribunal tendrá unos efectos incalculables para las arcas públicas, respetuosamente disentimos.


Federico Hernández Denton
Juez Presidente

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

*Certiorari*

Yiyi Motors, Inc.

    Peticionario


      v.              CC-2004-675


Estado Libre Asociado de Puerto Rico, Secretario de Hacienda y Secretario de Transportación y Obras Públicas

    Recurridos


Opinión disidente emitida por la Jueza Asociada señora Fiol Matta


En San Juan, Puerto Rico, a 14 de octubre de 2009.

En virtud de la sección 2014 del Código de Rentas Internas de 1994, el Secretario de Hacienda tiene la potestad de imponer y cobrar arbitrios sobre todo vehículo de motor, nuevo o usado, que se importe a Puerto Rico. Según el inciso (c)(1) de la misma sección, el impuesto se computará sobre la base del "precio sugerido de venta al consumidor", fijado por el importador o distribuidor antes de arbitrios por la diferencia que surge cuando el precio final de venta del vehículo es mayor que el precio sugerido de venta al consumidor. La mayoría resuelve que esta acción constituye una imposición

ilegal de arbitrios y no el cobro válido de contribuciones adeudadas. No puedo suscribir esta conclusión.

I

Los tribunales tienen la función inherente de interpretar las leyes. Se puede discrepar en cuanto a los límites y los métodos adecuados para el ejercicio de interpretación estatutaria. Y ciertamente, se puede fallar en discernir entre "interpretación" y "creación" de la norma básica aplicable. Ello resultaría en una usurpación de las prerrogativas legislativas y socavaría el propósito de la ley. Pese lo anterior, la literalidad no siempre resulta en una interpretación válida y el cumplimiento cabal con nuestra función interpretativa no puede significar que cada vez que los jueces y las juezas utilicemos métodos de interpretación reconocidos, legislemos desde el estrado. Incluso, el adjudicador siempre tendrá que hacer uso de su función interpretativa para decidir si el lenguaje de un estatuto es claro o si existen dudas, según sus valoraciones profesionales.

Se ha dicho que el legislador construye las instituciones sociales con miras a la protección de los intereses y del bienestar del pueblo. Para ello los legisladores seleccionan ciertos objetivos, igualmente rechazando otros, para elaborar normas generales dirigidas a lograr un resultado particular. Estas normas son los instrumentos que los tribunales emplean para llegar al resultado querido. Véase, J.C. Cueto-Rúa, <u>Judicial Methods</u>

of Interpretation of the Law, Paul M. Herbert Law Center
Publications Institute, 1981, pág. 177.[101]   Aunque la
función del adjudicador no sustituye la del legislador,
están íntimamente ligadas por la fidelidad del adjudicador
a las preocupaciones y objetivos incorporados en la ley al
momento de atender y resolver el caso concreto.[102]

En el ejercicio de nuestra función interpretativa, los
jueces y las juezas deben valorar la certeza, la
estabilidad y la predictibilidad del significado de las
leyes.  En este sentido, la interpretación persigue siempre
descubrir la voluntad del legislador.  A menudo, resulta
suficiente el examen de los textos y los documentos del

---

[101] Véase además, M. Radin, A Short Way With Statutes, 56
Harv. L. Rev. 388, 407 (1942):

> A statute is better described as an instruction
> to administrators and courts to accomplish a
> definite result, usually the securing or
> maintaining of recognized social, political, or
> economic values.  If figures of speech help, we
> may call the statute a ground design, or a plan
> in which details are given only so far as they
> are necessary to assure the erection of the
> desired structure.

[102] "A judge who views legislative enactments as
instrumental or remedial tools, which is the predominant
perspective from which the legislator himself looks at his
activities, and the judge who remains loyal to the concerns
and objectives of the legislator cannot, then, undertake
the interpretation and application of the rule of law as
though the rule were a mere logical entity beyond the
practical needs of the people or as though it were a purely
historical object having roots in a past that exists no
more.  Instead, the mission of a judge may be seen as being
essentially linked to that of the legislator, committed to
the achievement of the same legislative purpose in each of
the concrete and individual cases brought before him." J.C.
Cueto-Rua, Judicial Methods of Interpretation of the Law,
Paul M. Herbert Law Center Publications Institute, 1981,
págs. 177-178.

proceso legislativo "y no hay ni adaptabilidad ni creatividad en la interpretación apropiada". J. Wróblewski, <u>Constitución y teoría general de la interpretación jurídica</u>, Madrid, Editorial Civitas, S.A., 1985, pág. 75. No obstante, en ciertas situaciones, la interpretación legal exige adecuar la norma a las necesidades de la vida social, y ello, ciertamente, da paso a una tarea creativa, mas no a "legislación judicial". Véase, Wróblewski, <u>op. cit.,</u> pág. 77. Es esta una "ideología dinámica" de interpretación legal, que no deja de ser un ejercicio válido de adjudicación, toda vez que con ella no se suplantan los objetivos y las preocupaciones que motivaron al legislador.[103]

Particularmente, la norma respecto al análisis hermenéutico de las leyes tributarias es que éstas deben interpretarse restrictivamente. Véanse, H.C. Black, <u>Handbook on the Construction and Interpretation of the Laws</u>, West Publishing Co., 2da ed., St. Paul, Minnesota, 1911, pág. 515; E.T. Crawford, <u>The Construction of Statutes</u>, Thomas Law Book Company, St. Louis, 1940, pág. 502. Claro está, la interpretación restrictiva de las leyes contributivas debe ser razonable y consonante con la

---

[103] Pero además, resulta ser un ejercicio muy necesario, puesto que de otra forma "el derecho resultaría en un gobierno de los muertos sobre los vivos. El significado de las reglas cambia en la medida en que cambian los contextos en los que opera". J. Wróblewski <u>Constitución y teoría general de la interpretación jurídica</u>, Madrid, Editorial Civitas, S.A., 1985, pág. 76.

voluntad legislativa, de forma que se preserve su propósito social.   Los tratadistas Bernier y Cuevas Segarra coinciden con esta premisa al expresar lo siguiente:

> No debe olvidarse que estas reglas de interpretación estricta deben armonizarse con la otra regla que señala que las leyes que imponen contribuciones deben recibir una interpretación razonable tendiente a llevar a efecto el propósito y la intención del legislador. También, que cuando el estatuto es claro y preciso no se aplican las reglas de hermenéutica que son simples ayudas para encontrar la voluntad legislativa. Además, que **tampoco se puede interpretar una ley contributiva de manera que facilite la evasión del pago de contribuciones que la Asamblea Legislativa ha intentado imponer**. (Citas omitidas y énfasis suplido.) R.E. Bernier y J.A. Cuevas Segarra, Aprobación o interpretación de las leyes en Puerto Rico, Vol. II, 2da ed. revisada y ampliada, Publicaciones JTS, 1987, pág. 466. Véase además, Crawford, *op. cit.*, pág. 504.[104]

Por estas razones, coincido con la opinión mayoritaria en cuanto expresa que aunque la ley parezca clara, requiere interpretación para buscar y proteger la intención del

---

[104] Sobre este precepto nos hemos expresado en Licorería Trigo, Inc. v. Secretario de Hacienda, 94 D.P.R. 270, 279 (1967), y hemos dado el visto bueno a la interpretación restrictiva de las leyes contributivas, pero no a espaldas de la voluntad del legislador.

Véase, United States v. One Hundred Barrels of Spirits, 2 Abb. 305, Fed. Cas. No. 15,948, que explica el deber de los tribunales de buscar la verdadera intención del legislador al interpretar las leyes contributivas:
"But it is the duty of the court to study the whole statute, its policy, its spirit, its purpose, its language, and, giving to the words their obvious and natural import, to read the act with these aids in such a way as will best effectuate the intention of the legislature.  Legislative intention is the guide to true interpretation."

legislador. Desafortunadamente, la interpretación que efectúa la mayoría en este caso no procura proteger la intención del legislador, que fue la de simplificar el sistema de tributación a beneficio del Departamento de Hacienda y evitar el fraude contributivo.

II

El 17 de octubre de 1992, la Asamblea Legislativa aprobó la Ley Núm. 80, que enmendó la Ley de Arbitrios del Estado Libre Asociado de Puerto Rico de 1987, Ley Núm. 5 de 8 de octubre de 1987 (13 L.P.R.A. sec. 7002(a)). De esta forma, sustituyó la base contributiva sobre la cual se calculaban anteriormente los arbitrios de los vehículos introducidos a Puerto Rico. A partir de la Ley Núm. 80, <u>supra</u>, el arbitrio a los vehículos nuevos se impone sobre el precio sugerido de venta al consumidor, en vez de utilizarse el sistema anterior basado en peso y caballaje. Al aprobarse el Código de Rentas Internas de 1994, se mantuvieron las enmiendas de la Ley Núm. 80. En este proceso, la definición del precio sugerido de venta de la Ley Núm. 5, según enmendada, permaneció prácticamente inalterada en el Código de Rentas Internas. La misma dispone:

> En el caso de automóviles nuevos y de vehículos de uso múltiple nuevos, introducidos al país por distribuidores y traficantes autorizados, **el precio sugerido de venta al consumidor incluirá el costo básico del modelo del automóvil nuevo y del vehículo de uso múltiple nuevo incluyendo el equipo opcional instalado de fábrica, más el seguro y**

**flete de importación, el margen de ganancia para la venta, y los costos asociados con la preparación y entrega del vehículo.** (Énfasis nuestro.) Código de Rentas Internas de 1994, Ley Núm. 223 de 30 de noviembre de 1995, 13 L.P.R.A. sec. 9001 *et seq.* (13 L.P.R.A. sec. 9001 (a) (15) (A)) Véase, Sec. 1.002(15) de la Ley Núm. 5, <u>supra</u>.

Así también se incluyeron en el Código de Rentas Internas las disposiciones de la sección 2.009 de la Ley Núm. 5, 13 L.P.R.A. sec. 7059:

El precio sugerido de venta al consumidor de los automóviles nuevos y usados y de los vehículos de uso múltiples nuevos y usados, será determinado por el importador o distribuidor conforme lo dispone esta parte antes de introducir el vehículo a Puerto Rico. Disponiéndose, que **el precio sugerido de venta al consumidor, para cada vehículo, no tiene necesariamente que ser igual para todos los concesionarios pero el arbitrio a pagar se determinará y pagará conforme el precio sugerido de venta al consumidor <u>que aparezca en el rótulo de precios adherido al vehículo</u> y determinado por el distribuidor.** (Énfasis suplido.) Sec. 2014 del Código de Rentas Internas de 1994, 13 L.P.R.A. sec. 9014 (c) (1).

Si bien es cierto que estas disposiciones no precisan que el precio sugerido de venta al consumidor necesariamente sea el precio final de venta, la ley y su reglamento hacen lo posible para que ambas concuerden. Del historial legislativo surge que aunque el propósito de la Ley Núm. 80 no fue fijar un impuesto sobre la venta, la Asamblea Legislativa quiso establecer un sistema igualmente objetivo en aras de lograr que la base del cómputo de arbitrios sea el equivalente al precio final de venta.

Así, la base contributiva, es decir, el precio sugerido de venta al consumidor, contempla todos los elementos necesarios para configurar un precio de oferta dirigida al consumidor, específicamente, el margen de ganancias y todos los costos que conlleva la importación y la entrega del vehículo. Esto surge del debate legislativo que el Tribunal cita "*ad verbatim*".

La ley, que finalmente fue aprobada el 17 de octubre de 1992, surgió de un proyecto que sustituyó el Proyecto de la Cámara 1707. El proyecto original establecía el precio de venta como base para el cálculo de arbitrios, es decir, una especie de impuesto sobre la venta. Particularmente, el inciso (b) del artículo 2 del proyecto original disponía dos maneras de cobrar el arbitrio. El impuesto se pagaría sobre el precio final de venta a los diez días de la transacción o sobre el precio contributivo estimado a los seis meses de la fecha de introducción del vehículo, **lo primero que ocurriera.** De aplicarse esta última disposición, el impuesto se ajustaría cuando se vendiera finalmente el vehículo. P. de la C. 1707 de 19 de mayo de 1992.

Por otra parte, en cuanto al cómputo de los arbitrios, el proyecto original de la Cámara no adoptó el término que hoy contempla la ley del "precio sugerido de venta al consumidor", sino que estableció que los arbitrios se calcularían sobre la base del "costo en Puerto Rico", el cual

> …será el precio f.o.b. ["free on board"] fábrica cotizado por el fabricante de dichos automóviles a sus distribuidores en Puerto Rico, más un diez por ciento (10%) sobre el f.o.b. fábrica por concepto de fletes y de seguros. Art. 1(3)(a) del P. de la C. 1707 de 19 de mayo de 1992.

Ciertamente, las citas del debate legislativo transcritas en la Opinión del Tribunal indican que el Departamento de Hacienda recomendó rechazar estos criterios e implantar un sistema más objetivo, lo cual se atendió en el proyecto sustitutivo con la incorporación del término "precio sugerido de venta al consumidor". En dicha definición se reúnen todos los elementos necesarios para calcular el precio por el cual se debiera vender finalmente el vehículo y sobre ello se computaría el arbitrio. La diferencia entre los dos proyectos estriba en el momento en que se cobraría el arbitrio.

El Departamento de Hacienda recomendó que el evento contributivo, es decir, el momento en que se cobraría la contribución, fuera cierto, puesto que de otra forma "afectaría el flujo de fondos" al Estado. Diario de Sesiones de la Cámara de Representantes de 2 octubre 1992, págs. 54-55. Además, el cobrar la contribución al momento de la venta o un "precio contributivo estimado" a los seis meses de que el vehículo se introdujera a la isla y ajustar dicho cómputo posteriormente con el precio real de venta, requeriría una contabilidad muy compleja y más difícil para el Departamento de Hacienda manejar. Íd.

El Proyecto Sustitutivo tomó en consideración estas preocupaciones y propuso que la base del cobro de arbitrio fuera el precio sugerido de venta al consumidor: "Así las cosas, hemos preparado este Sustitutivo del Proyecto 1707, que utiliza el precio de venta sugerido. **Fíjense que es lo más que se acerca al precio de venta al consumidor**". (Énfasis nuestro.) Íd.

La restructuración del sistema de imposición y cobro de arbitrios a los vehículos importados a Puerto Rico surge de una preocupación fundamental de evitar un esquema de fraude contributivo. En el debate en la Cámara de Representantes sobre la Ley Núm. 80 de 17 de octubre de 1992 se puso en manifiesto la intención de evitar el fraude y asegurar el mercado libre en beneficio del consumidor. En particular, el Representante José Ronaldo Jarabo, Presidente de la Cámara de Representantes de la Asamblea Legislativa, expuso que en el antiguo sistema de peso y caballaje había un segundo criterio para el cálculo del arbitrio, el factor FOB o "free on board" que catalogó como "desconfiable". Éste se refiere al precio de la mercancía declarado para efectos de la cubierta del medio de transportación, es decir, la cubierta del barco o del tren. Según explica el representante y proponente del proyecto,

> …se supone que ese FOB refleje únicamente, y estrictamente, el costo en fabrica [sic] de ese vehículo. En la realidad comercial refleja el producto o resultado de una negociación entre el importador y el fabricante. Es decir, no es un valor que responda al costo real del vehículo,

sino por el contrario, es un valor que responde a la transacción a la que llegan en su negociación comercial, en su contratación, el fabricante y el importador. …[E]n lugar de usar la cifra esa elástica, misteriosa, desconfiable, el FOB, [el proyecto de ley] va a utilizar el cálculo de cuál será el precio de venta al consumidor, **que incluye todos los costos, incluyendo las ganancias del importador y el concesionario, si hay un concesionario distinto al importador. Y ese precio será rotulado y puesto en el cristal del vehículo, de manera que el consumidor vea sobre qué cantidad es que está pagando.**

**Esto permite una certeza que evita las lagunas y los huecos que tiene la actual ley, y que la hacen vulnerable al fraude.** Diario de Sesiones de la Cámara de Representantes de 2 octubre 1992, pág. 52 y 55. (Énfasis suplido.)

Conforme la facultad delegada al Secretario de Hacienda de hacer cumplir las leyes bajo su encargo, el 18 de enero de 1994 el Departamento de Hacienda aprobó el "Reglamento para la implantación de la Ley Núm. 80 del 17 de octubre de 1992; Ley para Establecer un Nuevo Sistema de Arbitrios Sobre Automóviles y Otros Vehículos de Motor", Reglamento Núm. 5020 del Departamento de Hacienda. En el mismo, se asegura que el precio sugerido de venta sea el precio al que el concesionario finalmente venda el vehículo.

El artículo 3(13) del Reglamento Núm. 5020, a su vez, dispone que la base del precio contributivo será el precio sugerido de venta al consumidor, el cual define de la manera siguiente:

(a) <u>Vehículos Nuevos para la Venta</u>: En el caso de automóviles nuevos y de vehículos nuevos y de vehículos de uso múltiple nuevos, introducidos al país por distribuidores y traficantes autorizados, el "precio sugerido de venta al consumidor" significará aquel precio por el cual el vehículo o vehículos similares serán vendidos al detal al público consumidor en el mercado libre, excluyendo el arbitrio, independientemente de si el vehículo en particular va a ser vendido a un precio menor por razón de cualquier consideración comercial o de cualquier otro tipo. Este "precio sugerido de venta al consumidor" nunca podrá ser menor al costo básico del modelo. El precio sugerido de venta al consumidor incluirá el costo básico del modelo y lo siguiente: el equipo opcional instalado en fábrica; el equipo opcional instalado en Puerto Rico; los seguros y fletes de importación; **el margen de ganancia para la venta**; los costos asociados con la preparación y entrega del vehículo; y, cualquier otro costo relacionado con la entrega del vehículo. Disponiéndose, sin embargo, que el "precio sugerido de venta al consumidor" no tiene necesariamente que ser igual para todos los concesionarios… **Toda declaración de venta en exceso del precio sugerido de venta al consumidor deberá ser evidenciada para determinar si el incremento está sujeto al pago de arbitrios adicionales.** (Énfasis suplido.) Reglamento Núm. 5020, <u>supra</u>, Art. 3(14), págs. 6-7.

La exposición de motivos de la Ley Núm. 80, <u>supra</u>, indica claramente que el precio final de venta al consumidor debe ser fijado por mutuo acuerdo entre el distribuidor/importador y el concesionario que venderá los vehículos al detal. <u>Leyes y resoluciones de Puerto Rico</u>, Parte 1, Butterworth de Puerto Rico, San Juan, 1993, pág. 389. Así pues, el artículo 4(1)(4) del Reglamento Núm. 5020 dispone que:

En el caso de distribuidores que importan automóviles y vehículos de uso múltiple nuevos a Puerto Rico y que mantienen una relación comercial con uno o más "dealers" a los fines de que estos "dealers" realicen las ventas al detal de dichos vehículos, **el precio sugerido de venta al consumidor… será aquel que el dealer [sic] utilizará para la venta de dichos vehículos.**

Esto presupone que el distribuidor deberá determinar el precio sugerido de venta al consumidor para el embarque correspondiente, **incluyendo todos los elementos de precio necesarios que hacen posible la presentación de los vehículos al público consumidor <u>y que constituyen el precio de oferta de estos vehículos al detal</u>**. (Énfasis nuestro.) Reglamento Núm. 5020, <u>supra</u>, pág. 12.

La ley dispone que el arbitrio se determinará y pagará conforme el precio sugerido de venta al consumidor que aparezca en el rótulo de precios adherido al vehículo, el cual, además, debe ser el precio por el cual se ofrece la unidad al consumidor. Véase, 13 L.P.R.A. sec. 9014(c)(1). Por ello, y para asegurarse de que sea así, el reglamento establece un procedimiento de enmiendas al rótulo. Véase, Art. 2011(a)-4(d) del Reglamento Núm. 7437 del Departamento de Hacienda de 14 de diciembre de 2007, págs. 56-57; Art. 4(4) y (5), y Art. 9 del Reglamento Núm. 5020, <u>supra</u>, págs. 12-14 y 26-29.

Sin embargo, la mayoría del Tribunal entiende que el reglamento que implementa la ley es nulo porque la intervención del Secretario de Hacienda debe limitarse exclusivamente al momento de la introducción del vehículo

al país, y su facultad está limitada a adjudicar la
razonabilidad el precio declarado en dicho momento. Lo que
la mayoría del Tribunal no alcanza a ver es que la
controversia que hoy atendemos no versa sobre la
razonabilidad del precio sugerido, sino que se refiere a la
facultad del Secretario de Hacienda de ejercer sus
funciones según la intención de la ley de reducir las
instancias de evasión contributiva que se dan a través de
los cambios posteriores al precio sugerido de venta. El
problema tributario surge cuando el concesionario decide
aumentar por su cuenta el precio por el cual se ofrece el
vehículo, para acrecentar sus ganancias.[105] Con ello burla
el sistema establecido y la intención legislativa, según la
cual, para efectos tributarios, el concesionario debe

---

[105] En la discusión en el Senado sobre el Informe de
Conferencia del Sustitutivo al P. de la C. 1701 del 8 de
octubre de 1992, el señor Nogueras, hijo, explicó las
razones por las cuales se abstuvo de votar.
Particularmente, con relación a la incertidumbre del costo
de los vehículos y el margen de ganancias que generalmente
perciben los concesionarios por la venta, expresó lo
siguiente:

> Yo creo que el esfuerzo es válido, yo creo que
> las medidas que mejoran los enfoques en este tipo
> de asunto son útiles, sin embargo, me parece que
> aquí hay un campo misterioso que siempre surge
> cuando se brega con la venta de automóviles. Yo
> me recuerdo, salvo que hubiera ocurrido lo
> contrario en las últimas semanas, que no hubo un
> solo distribuidor o vendedor de automóviles que
> le sometiera la Comisión de Hacienda dato alguno
> sobre el verdadero costo de ese automóvil puesto
> en Puerto Rico. Y sobre el margen de beneficio
> que tenía la venta que se hacía a los
> consumidores. Y me recuerdo que se le requirió
> muchas veces en la Comisión de Hacienda y que
> nunca tuvimos a nuestro alcance esa información.
> Íd., pág. 36.

acordar su margen de ganancias con el distribuidor, estableciéndose de esta forma el precio sugerido de venta que habrá de declarar.  Hacer esto sin cambiar el precio anunciado en la etiqueta adhesiva, en primer lugar, constituye fraude al consumidor, toda vez que el efecto es ofrecer el vehículo a un precio mayor al que se debe anunciar, según el esquema legislativo.  Es también fraude al erario, puesto que el efecto premeditado es evitar pagar la totalidad de los arbitrios debidos.

No obstante, la mayoría entiende que exigir el pago total de los arbitrios debidos es sustituir la base fiscal, razonando sobre la premisa del articulado que dispone que el Secretario podrá sustituir el precio sugerido de venta declarado por el distribuidor cuando entienda que tal cálculo resulte irrazonable.  La mayoría entiende la intención del legislador fue permitir la intervención del Secretario de Hacienda exclusivamente antes de autorizar la introducción de los vehículos y que, por lo tanto, cualquier intervención posterior del Secretario, aunque esté motivado por su deber de hacer cumplir el propósito de la ley, constituye una alteración de la base fiscal.

Las actuaciones del Secretario de Hacienda no constituyen un subterfugio para aplicar un criterio rechazado por la Asamblea Legislativa.  No se está cobrando un impuesto adicional sobre la venta del vehículo.  Más bien, al pedir los documentos que acrediten el precio por el cual se ofreció el vehículo y el precio por el cual se

vendió, el Secretario está fiscalizando, como único puede, que el margen de ganancia que se estimó que percibiría el concesionario por la venta de cada unidad, no se haya incrementado ilegalmente, en detrimento de las arcas del Estado y perjudicando al consumidor. La decisión de la mayoría le quita estas herramientas al Secretario para combatir la evasión contributiva.

Es cierto que la intención de la ley, según la exposición de motivos de la Ley Núm. 80, fue limitar la intervención de agentes ajenos a la maquinaria del mercado libre, con excepción de la intervención del Secretario de Hacienda antes de introducir los vehículos al mercado. Sin embargo, no es menos cierto que el sistema tributario se estableció de tal manera precisamente para que sean estas "fuerzas naturales de la competencia económica que promuev[a]n que verdaderamente se identifique el precio sugerido como el precio real al que se espera que se venda ese vehículo". Diario de Sesiones de 2 de octubre de 1992, supra, pág. 55. Claro está, la ley no exige que el precio sugerido de venta sea el precio final de venta, ya que permite que las fuerzas del mercado intervengan en el negocio con el consumidor. Lo que sí exige la ley es que, al menos, el precio final de venta el vehículo no sea mayor que el precio sugerido, puesto que en un sistema de libre mercado un consumidor difícilmente convendrá pagar más que el precio al cual se le ofreció la mercancía. Para eso es que la ley permite un estimado del margen de ganancias,

para que el concesionario tenga flexibilidad al negociar con el consumidor el precio final, pero no en detrimento de las arcas del Estado.

Finalmente, debo mencionar que, en nota al calce, la mayoría anula las disposiciones reglamentarias que conceden facultad al Secretario de Hacienda para cobrar la deficiencia en los arbitrios al concesionario cuando éste, por su propia decisión, inimputable al distribuidor, no sigue el procedimiento de enmienda al precio sugerido de venta en la etiqueta adhesiva. Aunque esta controversia no está ante nuestra atención, como bien señala la Opinión del Tribunal, el Tribunal igualmente entra a adjudicarla, claramente sin jurisdicción. Además, en el texto de la opinión misma, se reitera esta conclusión al establecerse que el concesionario no debe estar sujeto a los procedimientos de cobro de arbitrios.

III

Para evitar el fraude contributivo y para regir el ejercicio de las facultades fiscalizadoras del Estado[106] y con el fin de aplicar y administrar las leyes contributivas que imponen arbitrios, el Secretario de Hacienda puede "[e]xaminar récords, **documentos**, bienes, locales, predios, inventarios **o cualquier otro material relacionado con artículos, transacciones, negocios, ocupaciones o**

---

[106] El artículo 9 de la Ley Núm. 80, supra, encomienda al Departamento de Hacienda y al Departamento de Asuntos del Consumidor la fiscalización del cumplimiento de esta ley.

**actividades sujetas a los impuestos** y derechos establecidos por la Parte IV". (Énfasis nuestro.) Sec. 6140(a)(1) del Código de Rentas Internas de 1994, 13 L.P.R.A. sec. 8140(a)(1). El Reglamento Núm. 5020 establece, además, un procedimiento para aquellos casos en los que el precio fijado por el distribuidor o importador, sobre el cual se pagaron los arbitrios, sea menor al precio de oferta al detal exhibido en la etiqueta adherida al vehículo. Véase, Reglamento Núm. 5020, supra, Art. 4 (4) y (5), págs. 12-14.[107]

---

[107] El Reglamento Núm. 5020, supra, establece lo siguiente:

"(4)...En el caso de que el distribuidor incluya en la Declaración de Arbitrios un precio sugerido de venta al consumidor menor al precio de oferta al detal que el dealer [sic] exhibirá para el vehículo particular, será responsabilidad del distribuidor radicar ante el Director una Declaración de Arbitrios enmendada que refleje la diferencia en el precio sugerido de venta al consumidor y el arbitrio a pagar. En este caso, el Negociado de Arbitrios permitirá al distribuidor una nueva etiqueta adhesiva, según se establece en el Artículo 9 de este Reglamento, que reflejará el nuevo precio sugerido de venta al consumidor y que sustituirá la etiqueta que originalmente se le entregó a dicho distribuidor para el vehículo en particular.

"(5) No obstante lo anteriormente dispuesto, cuando sea el 'dealer' el que gestione un aumento al 'precio sugerido de venta al consumidor' por razón de fluctuaciones de mercado o por cualquier otra causa particular, el 'dealer' deberá notificar inmediatamente al distribuidor su deseo de solicitar el aumento y la emisión de una nueva etiqueta adhesiva, acompañando con la solicitud el importe correspondiente a la diferencia en el pago de arbitrios. Una vez recibida por el distribuidor la correspondiente solicitud del 'dealer', el distribuidor deberá entonces

Como la ley exige que el precio de venta se plasme en la etiqueta adhesiva, el reglamento dispone lo siguiente en torno a la emisión de la certificación de pago de arbitrios:

> (6) Luego de efectuada la venta al detal del automóvil o vehículo de uso múltiple correspondiente, el contribuyente deberá radicar ante el Departamento de Hacienda la Declaración de Ventas que forma parte de la Etiqueta Adhesiva debidamente complementada, o cualquier otro documento que requiera el Secretario y que sea demostrativo de la venta. Esto constituirá un requisito previo a que el Secretario entregue a dicho contribuyente la Certificación de Pago de Arbitrios que permitirá al comprador registrar el vehículo en el Departamento de Transportación y Obras Públicas. Reglamento Núm. 5020, supra, Art. 9 (6), pág. 28.

A propósito de la aprobación del Reglamento Núm. 5020, supra, el Departamento de Hacienda emitió un boletín informativo el 30 de junio de 1994 en el cual daba aviso a los traficantes de vehículos de motor de que el sistema mecanizado para vehículos de motor de Negociado de

radicar la misma al Director y se emitirá una nueva etiqueta…

"En aquellos casos en que el 'dealer' no informe al distribuidor su intención de aumentar el 'precio sugerido de venta al consumidor' y no acompañe el pago de arbitrios por la diferencia, será responsabilidad de dicho 'dealer' el pago de los arbitrios por la diferencia, más los intereses, penalidades, multas y recargos correspondientes. No obstante, en aquellos casos donde el 'dealer' notifique por escrito al distribuidor el 'precio sugerido de venta al consumidor' para un vehículo en particular, el distribuidor deberá declarar dicho vehículo con el 'precio sugerido de venta al consumidor' notificado por dicho 'dealer'..." Reglamento Núm. 5020, supra, Art. 4(4) y (5), págs. 12-14.

Arbitrios comenzaría a funcionar.[108]  Entre los cambios

mayores en el funcionamiento del nuevo sistema, se

destacaron los siguientes:

> 7. Al ser realizado el pago del arbitrio de
>    automóviles y vehículos uso múltiple [sic], el
>    Negociado de Arbitrios emitirá una
>    Certificación de Pago de Arbitrios ó [sic]
>    Exoneración Concedida, válida solamente para
>    propósitos financieros.
>
> 8. Para poder obtener la Certificación de Pago de
>    Arbitrios ó [sic] Exoneración Concedida, válida
>    para el Departamento de Transportación y Obras
>    Públicas, será requisito que el arbitrio de los
>    automóviles y vehículos de usos múltiples haya
>    sido pagado y sea presentado el Boleto
>    Indicativo de la Venta, debidamente
>    cumplimentado, junto con copia del contrato de
>    compra venta [sic].  Esto aplicará en el caso
>    de automóviles y vehículos de usos múltiples
>    nuevos, según lo define la Ley y el Reglamento.

Luego de "evaluar la complejidad y eficiencia de los

procedimientos implantados en el Sistema Computarizado para

el registro de la declaración de venta y la entrega de la

certificación de pago de arbitrios", el Departamento de

Hacienda emitió otro boletín informativo el 6 de diciembre

del mismo año para explicar los cambios en los

procedimientos de entrega de dicha certificación a todos

los traficantes de vehículos de motor. En particular, se

anunció que cuando ha habido cambios en la declaración de

un precio sugerido de venta, el Departamento de Hacienda

requerirá la declaración de venta que forma parte de la

---

[108] El Código de Rentas Internas dispone que los boletines informativos y cartas circulares "constituyen la interpretación oficial de la ley que el Secretario de Hacienda está encargado de interpretar". 13 L.P.R.A. sec. 8130.

etiqueta adhesiva debidamente completada o cualquier otro documento demostrativo de la venta.[109]

El 30 de octubre de 2002, el Departamento de Hacienda dejó sin efecto el boletín del 6 de diciembre de 1994, al emitir el Boletín Informativo de Rentas Internas Núm. 02-01. En este boletín se reiteró la obligación de los distribuidores o traficantes autorizados de presentar "la declaración de venta, la Parte B de la Etiqueta, debidamente completada o cualquier otro documento que sea demostrativo de la venta" ante el Negociado de Arbitrios Generales.  Además se aclaró que:

> No se entregará la CPA [certificación de pago de arbitrios] con respecto a vehículos introducidos y vendidos para su registro en el Departamento de Transportación y Obras Públicas a ningún traficante que no haya cumplido con la radicación en el Negociado de Arbitrios Generales de la Parte B de la Etiqueta.

> No obstante, al efectuarse el pago de los arbitrios de un vehículo que no se haya vendido (inventario) el Secretario entregará al

---

[109] En el boletín informativo de 6 de diciembre de 1994, el Departamento de Hacienda hace una distinción entre los traficantes afianzados y los no afianzados.  En cuanto a los traficantes afianzados, la entrega de la certificación de pago de arbitrios se hará luego del pago total de los arbitrios declarados que permita al traficante, al banco o al comprador registrar el vehículo en el Departamento de Transportación y Obras Públicas. Para los traficantes no afianzados, "se mantendrá el procedimiento establecimiento en el Boletín Informativo del 30 de junio de 1994, emitido conforme al Reglamento para la Implantación de la Ley Núm. 80 del 17 de octubre de 1992".  En fin, para ambos tipos de traficantes de vehículos, el Departamento de Hacienda requirió la declaración de venta que forma parte de la etiqueta adhesiva y el contrato de compraventa para la emisión de la certificación de pago de arbitrios.

contribuyente un recibo de pago que le permitirá realizar cualquier trámite en el financiamiento comercial. Si al efectuarse la radicación de la Parte B en la Etiqueta surge cualquier diferencia en el pago de arbitrios, el traficante autorizado deberá efectuar el pago total de los arbitrios más los intereses, recargos y multas antes que el Negociado de Arbitrios Generales entregue la CPA para registro del vehículo en el Departamento de Transportación y Obras Públicas.

Este sistema reglamentario se mantuvo a través de los varios reglamentos posteriores del Departamento de Hacienda. El "Reglamento para implantar las disposiciones del Subtítulo B, de la Ley Núm. 120 de 31 de octubre de 1994" derogó el Reglamento Núm. 5020, supra, pero se mantuvo la misma definición de "precio sugerido de venta al consumidor" y el procedimiento para la declaración de arbitrios en casos de automóviles. Véase, Artículo 2001-1(28) y Artículos 2014(a) y (c) del Reglamento Núm. 7215 del 1 de septiembre de 2006. El reglamento vigente al día de hoy conserva el mismo nombre que el anterior, bajo el número de radicación 7437. Este reglamento derogó el Reglamento Núm. 7215, pero nuevamente se sostuvo el sistema tributario implantado desde el Reglamento Núm. 5020, supra.[110]

---

[110] El Reglamento Núm. 7437 dispone que en él se recoge el estado de derecho vigente, por lo que no hay problema con su aplicación retroactiva. No obstante, el reglamento también dispone que aquellas disposiciones que representen un cambio en el estado de derecho no tendrán efecto retroactivo a menos que surja la intención expresamente. Íd., pág. 143.

En cuanto al procedimiento de imposición de arbitrios, el nuevo reglamento continúa la práctica de entregar un recibo de pago, al momento de pagar los arbitrios, junto con una certificación de pago de arbitrios, para poder registrar el vehículo a nombre del comprador en el Departamento de Transportación y Obras Públicas. "Esta certificación de pago de arbitrios será entregada por el Secretario al momento de someterse la declaración de ventas que establece el Artículo 2011(c)(3)-5". Art. 2011(a)-2(d) del Reglamento Núm. 7437, supra, pág. 49.[111]

Esto es cónsono con las medidas para asegurar el cumplimiento con las leyes contributivas. Al respecto, se ha establecido que: "No se otorgará a persona alguna una licencia o tablilla para un vehículo gravado por esta parte, ni el Secretario de Transportación y Obras Públicas emitirá tal licencia o tablilla, a menos que la persona muestre evidencia fehaciente del pago del arbitrio fijado en esta sección o de la exención concedida, si alguna, según sea el caso". 13 L.P.R.A. sec. 9014(c)(9).

---

[111] El artículo al que se hace referencia exige que, luego de efectuarse la venta del automóvil, el concesionario, el importador o el distribuidor entregue al Departamento de Hacienda el Boleto de Verificación de Venta de Vehículo de Motor, Parte B de la etiqueta, debidamente completada o cualquier otro documento que requiera el Secretario y que sea demostrativo de la venta. Art. 2011(c)(3)-5 del Reglamento Núm. 7437, supra, págs. 66-67. "Esto constituirá un requisito previo a que el Secretario entregue a dicho vendedor de vehículos de motor al detal (o concesionario), importador o distribuidor la Certificación de Pago de Arbitrios que permitirá registrar el automóvil en el Departamento de Transportación y Obras Públicas". Íd., pág. 67.

El Secretario de Transportación y Obras Públicas tiene la encomienda de establecer y mantener un registro de todos los vehículos de motor importados, que transiten o se encuentren en Puerto Rico. El registro deberá contener toda la información sobre la introducción del vehículo, su distribución, venta, traspaso, exportación, desaparición, robo, destrucción, apropiación ilegal, confiscación, abandono, desmantelamiento y alteración sustancial. Art. 4 de la Ley Núm. 8 de 5 de agosto de 1987, según enmendada (9 L.P.R.A. sec. 3203). Para cumplir con sus funciones, la Ley para la Protección de la Propiedad Vehicular le exige al Secretario de Hacienda proveerle al Secretario de Transportación y Obras Públicas cierta información para que proceda con el registro de los vehículos que se introduzcan al país. Entre otros datos, el Secretario de Hacienda debe informar la cantidad pagada en arbitrios, la fecha de pago y el nombre de la persona o entidad que realizó el pago. 9 L.P.R.A. sec. 3207.

Además, el Secretario de Transportación y Obras Públicas tiene la facultad de reglamentar "todo lo concerniente a la concesión al registro provisional, y a la documentación que estime necesaria para inscribir finalmente cualquier vehículo de motor... en el registro". 9 L.P.R.A. sec. 5010. Así pues, la reglamentación del Departamento de Transportación y Obras Públicas dispone que de ninguna forma se podrá inscribir un vehículo en el registro de vehículos, sin contar con el pago de los

arbitrios correspondientes. El "Reglamento para establecer el procedimiento [de] registración de vehículos de motor y arrastres cuando falte algún documento requerido de 31 de marzo de 1993" define el Registro de vehículos de motor y arrastre como "el inventario oficial permanente que contiene el universo de vehículos de motor y arrastres autorizados a transitar por las vías públicas de Puerto Rico" y enumera la información que contendrá. Artículos III y IV del Reglamento Núm. 4900 del Departamento de Transportación y Obras Públicas, págs. 2-3. El artículo V dispone:

> Toda solicitud de inscripción de un vehículo de motor y arrastre se radicará en el documento que provea el Secretario [de Transportación y Obras Públicas] acompañado [sic] la misma de un recibo o documento creditivo [sic] de haberse pagado al Secretario de Hacienda los correspondientes arbitrios de acuerdo a lo preceptuado en la Ley de Rentas Internas de Puerto Rico. Reglamento Núm. 4900, supra, pág. 3.

El reglamento dispone lo mismo en cuanto al registro provisional de vehículos. En particular, el artículo VIII dispone:

> El Secretario [de Transportación y Obras Públicas] establecerá un registro provisional de los vehículos que estarán autorizados a transitar por las vías públicas por un período que no excederá de treinta (30) días sin el requisito del documento de titularidad… **Ningún vehículo podrá ser registrado por el Secretario sin haberse pagado los correspondientes arbitrios**… (Énfasis suplido.) Reglamento Núm. 4900, supra, pág. 6.

El "Reglamento para establecer titularidad, registros provisionales, expedición, expiración, renovación, duplicado, denegación de permisos ordinarios y especiales, pago de derechos escalonados, identificación de vehículo exento de inscripción y control de números de arrastres" de 29 de diciembre de 2000, también requiere evidencia de pago de arbitrios o la concesión de una exención para registrar provisionalmente los vehículos que no cuenten con el documento de titularidad necesario para la inscripción definitiva. Artículo VIII del Reglamento Núm. 6282 del Departamento de Transportación y Obras Públicas.[112]

IV

El artículo 6002 del Código de Rentas Internas de 1994 establece un procedimiento formal que impone al Secretario de Hacienda la obligación de notificarle al contribuyente su determinación de deficiencia y proveerle la oportunidad de impugnarla. El contribuyente podrá agotar los remedios administrativos o rechazarlos y proceder a impugnar la deficiencia mediante un juicio *de novo* en el Tribunal de Primera Instancia, luego de prestar una fianza. El Secretario de Hacienda no podrá comenzar un procedimiento de apremio o acción de cobro hasta la notificación de la

---

[112] El artículo XVII del Reglamento Núm. 6282 dispone que toda reglamentación o procedimiento administrativo que esté en vigor y que sea incompatible, en todo o en parte, con este reglamento quedará derogado. Íd., págs. 15-16. Las disposiciones citadas del Reglamento Núm. 4900 son completamente armonizables con lo dispuesto en el Reglamento Núm. 6282.

determinación final o que la sentencia del tribunal de instancia advenga firme. 13 L.P.R.A. sec. 8022.

A su vez, el Código de Rentas Internas también provee un mecanismo para solicitar un crédito o el reintegro de impuestos cuando el contribuyente entienda que ha pagado indebidamente o en exceso de lo debido. Las disposiciones de la sección 6020 rigen el procedimiento a seguir en los casos del pago en exceso de los arbitrios impuestos. Si se determina que procede el crédito o reintegro a raíz de la solicitud del contribuyente o *motu proprio*, el Secretario de Hacienda deberá investigar si el contribuyente tiene una deuda contributiva exigible y, de haberla, acreditar el crédito o el reintegro a ésta. Procedería entonces el reintegro del remanente. 13 L.P.R.A. sec. 8035. Por otro lado, si el Secretario de Hacienda deniega una solicitud de reintegro, aplican las disposiciones de las secciones 6030 a 6032 del Código de Rentas Internas. 13 L.P.R.A. secs. 8040-8042.[113]

El Código de Rentas Internas de 1994 dispone de estos remedios para cuestionar las actuaciones del Secretario de

---

[113] En <u>Cervecería India v. Srio. de Hacienda</u>, 80 D.P.R. 271, 275-276 (1958), resolvimos que bajo la antigua Ley de Rentas Internas, "el único procedimiento que existe para litigar arbitrios es mediante la revisión de una determinación de Secretario de Hacienda negándose a conceder una solicitud de reintegro". Es decir, para cuestionar el cobro de arbitrios o reclamar exención del pago de los mismos, el único recurso era pagar el arbitrio y proceder a solicitar un reintegro. Véase, G. Meléndez Carrucini, <u>Procedimiento Contributivo de Puerto Rico (Apelaciones Administrativas y Judiciales)</u>, Instituto de Contribuciones de Puerto Rico, Inc., 1981, págs. 957 y 969.

Hacienda. El remedio extraordinario del *injunction* no está incluido entre los remedios disponibles al contribuyente para cuestionar o impugnar el pago de arbitrios.

En <u>Barceló, Marques & Co. v. Sancho Bonet, Tes.</u> 55 D.P.R. 284 (1939), resolvimos que:

> No importa cuán errónea su interpretación… pueda haber sido, a él [el Secretario de Hacienda] no puede impedírsele mediante *injunction* que cobre la contribución, a menos que el rehusar conceder tal remedio, bajo las circunstancias del presente caso, resulte en una gran injusticia y ocasione daños irreparables a la demandante. Íd., pág. 288.

Reiteramos esta norma en <u>Fernández v. Buscaglia</u>, 60 D.P.R. 596 (1942), al resolver que el remedio del *injunction* se limita a aquellos casos que reflejan claramente que la contribución es ilegal y que: *(a)* el contribuyente carece de un remedio adecuado en ley, *o (b)* la contribución le ocasionaría daños irreparables, *o (c)* ésta daría lugar a una multiplicidad de pleitos." Íd., págs. 598-599. Luego, en <u>Cafeteros de P.R. v. Tesorero</u>, 74 D.P.R. 752 (1953), declaramos nuevamente que **"no procede un injunction**… en cuanto al pago de contribuciones **si el demandante tiene a su alcance** un remedio adecuado en ley en cuanto al pago o **reintegro de contribuciones"**. (Énfasis suplido.) Íd., págs. 763-764. Además, explicamos que:

> La regla que hemos enunciado (primero es pagar antes que litigar), está sólidamente basada en una política general inspirada en la

protección de intereses sociales de mayor validez y significación que el interés individual transitorio en rehuir el pago inmediato de una contribución. El gobierno no debe ser obstruído [sic] en el ejercicio de sus funciones. La doctrina prohibitoria de injunctions al existir un remedio adecuado en ley se basa en el deseo de evitar la paralización de las actividades gubernamentales, en armonía con la protección de los intereses legítimos del contribuyente al concederle a éste una oportunidad razonable de hacer valer sus derechos en el remedio ordinario en ley que está a su alcance. Íd., pág. 764.

V

Yiyi Motors solicita que declaremos que las actuaciones del Secretario de Hacienda aquí impugnadas son ilegales porque alteran la base fiscal del cómputo de los arbitrios, requieren sumariamente el pago de contribuciones e impeden el registro de los vehículos. En fin, el peticionario solicita que revoquemos la sentencia del Tribunal de Apelaciones que confirmó el dictamen del foro primario. Contrario a la mayoría de este Tribunal, entiendo que no procede lo solicitado.

Aunque es cierto que la Ley Núm. 80, supra, y el Código de Rentas Internas de 1994, supra, facultan al Secretario de Hacienda para revisar el precio sugerido de venta al momento de la introducción del vehículo a Puerto Rico, el Secretario de Hacienda también tiene la encomienda de velar por el cumplimiento de la ley y sus objetivos. La intención de la Ley Núm. 80, recogida en el Código de Rentas Internas y posteriormente puntualizada en el

Reglamento Núm. 5020 del Departamento de Hacienda, es que el precio final de venta sea equivalente al precio sugerido de venta al consumidor no solamente para evitar el fraude contributivo, sino también para asegurar los precios más bajos al consumidor. Ello a través de un procedimiento de rotulación que anuncie el precio de oferta del vehículo, el cual incluye el costo del vehículo, el flete y los seguros y el margen de ganancias.

No debemos olvidar que la ley prevé que el precio sugerido de venta al consumidor no concuerde necesariamente con el precio final de venta de la unidad, pues ésta es la naturaleza del mercado libre. Sin embargo, se estableció un procedimiento para enmendar el precio sugerido de venta, es decir, el precio por el cual se ofrece el vehículo, que, a su vez, debe estar notificado mediante rotulación en cada vehículo. En fin, la ley y su reglamento establecen un procedimiento que, de cumplirse, obliga al pago total de arbitrios, cual es el propósito del estatuto. Esta disposición sobre enmiendas al precio sugerido de venta al consumidor no debe hacerse inoperante simplemente porque el concesionario o el distribuidor-importador decida incumplir su obligación de modificar el precio sugerido siguiendo el procedimiento establecido.

Contrario a la interpretación de una mayoría de este Tribunal, un análisis del sistema contributivo impuesto por la Ley Núm. 80 y recogido en el Código de Rentas Internas nos lleva a concluir que el esquema tributario está

dirigido a que el precio sugerido de venta sea el precio de oferta de cada unidad. Esto se evidencia en la definición del precio sugerido de venta, la cual reúne todos los elementos necesarios para que un concesionario pueda calcular el precio por el cual efectivamente ofrecerá cada vehículo. Es sobre esta base que, según la ley, se debe computar el arbitrio; para ello se creó el sistema de rotulación.

Yiyi Motors cuestiona la legalidad del proceso de enmiendas al precio sugerido de venta y de rotulación del reglamento del Departamento de Hacienda porque, alegadamente, el Departamento está imponiendo una contribución adicional. El Tribunal avala estas alegaciones, con el efecto devastador de privar al Secretario de Hacienda del único instrumento que tiene para evitar el fraude contributivo que pueda ocurrir luego de la introducción de los vehículos.

Al pedir evidencia del precio real de venta y la etiqueta adhesiva que anuncia al consumidor el precio sugerido de venta, el Secretario de Hacienda efectivamente puede hacer cumplir el propósito de la ley. Es decir, mediante la presentación de tales documentos, se puede fiscalizar el proceso de declaración de arbitrios. El propósito es confirmar si el precio por el cual se ofrece cada vehículo y, a su vez, el precio por el cual se pagaron arbitrios, fue alterado ilegalmente. La declaración de un precio sugerido inferior al precio real de venta tiene el

efecto de evitar el pago completo de la contribución debida. Esto contraviene el procedimiento de enmiendas al precio sugerido de venta al consumidor, el cual salvaguarda la finalidad de la ley de arbitrios, al posibilitar la concordancia entre el precio declarado y el precio final de venta.

Avalar esta práctica también implica descartar una verdadera protección al consumidor, puesto que la rotulación de los vehículos con el precio por el cual los concesionarios están obligados a ofrecer cada unidad pone al consumidor en mejor posición para negociar un mejor precio. Además, permite que el consumidor pueda exigir que no se le venda un vehículo por encima del precio sugerido de venta rotulado en cada unidad.

No hay razón para que un concesionario no pueda cumplir con el requisito de rotulación y con los procesos de enmiendas al precio sugerido de venta. Los factores que componen el precio sugerido de venta al consumidor son datos objetivos fácilmente calculables y a la disposición del distribuidor, lo cual permite declarar el precio sugerido de venta al momento de la importación sin problema alguno. Dichos factores son: el costo básico del modelo, el equipo operacional instalado de fábrica, el seguro y flete de importación, los costos asociados con la preparación y entrega del vehículo y el margen de ganancia que pretende percibir por cada venta. Salvo un error inadvertido o un ajuste en el margen de ganancias, no sería necesario

enmendar los rótulos que anuncian el precio sugerido de venta al consumidor. El sistema implantado por el Departamento de Hacienda reconoce que el margen de ganancias puede ser objeto de cambios debido a la realidad de operaciones de un negocio. Por eso se permite corregir el precio sugerido de venta para reflejar lo que se debió haber notificado al momento de introducirse el vehículo. Es menester señalar que ello no implica, de por sí, que el margen de ganancias declarado originalmente fuera irrazonable.

No es sabio, ni nos corresponde, limitar la intervención del Secretario de Hacienda exclusivamente al momento de la introducción de los vehículos. Prohibir que el Secretario de Hacienda verifique las alteraciones a los precios sugeridos de venta en contravención al sistema de rotulación es reconocer abiertamente su impotencia ante un esquema de fraude y evasión contributiva.

De la misma forma, es evidente que la controversia ante nuestra consideración no gira en torno al pago de contribuciones adicionales, sino en torno a una interpretación del Secretario de Hacienda sobre el propósito de la Ley Núm. 80, _supra_, y las facultades delegadas por ésta. Nuestra función también es interpretativa, según hemos demostrado, y dirigida a hacer cumplir la intención legislativa.

Yiyi Motors alega que requerir sumariamente el pago de arbitrios en este caso violenta las disposiciones del Código de Rentas Internas para la determinación de una deficiencia contributiva. No tiene razón.  El Secretario de Hacienda tiene la facultad de velar por el cumplimiento de las leyes contributivas a su encargo y puede interpretar sus disposiciones. Si el contribuyente no está de acuerdo con una determinación del Secretario de Hacienda, tiene a su disposición los procedimientos de impugnación que provee el Código de Rentas Internas. Según explica la opinión disidente del Juez Presidente señor Hernández Denton, el *injunction* no es uno de los procedimientos que provee la ley para cuestionar las actuaciones del Secretario de Hacienda en un caso como éste.[114]

La misma parte peticionaria admite y explica que la ley establece los remedios disponibles por la vía administrativa para la impugnación de la contribución que el Departamento de Hacienda le requirió, derrotando en su misma argumentación la procedencia del *injunction*.[115]

---

[114] No surge del expediente que el Secretario de Hacienda haya emitido una determinación de deficiencia, ni que la parte peticionaria haya solicitado reconsideración ante el Departamento de Hacienda.  Tampoco surge del expediente que se hayan pagado los arbitrios que exigió el Departamento de Hacienda para que proceda una solicitud de reintegro. Además, el peticionario tiene otros remedios disponibles y el daño económico que alega sufrir la parte peticionaria no es un daño irreparable que amerite acudir a este remedio extraordinario. No podemos permitir el uso del recurso de *injunction* para evadir el procedimiento normal de revisión.

[115] En su petición de *certiorari*, Yiyi Motors alegó que "las contribuciones adicionales impuestas por el Secretario de

Por todo lo anterior, resolvería que el Secretario de Hacienda actuó en el ejercicio de su facultad de hacer cumplir las leyes tributarias. En cuanto al Secretario de Transportación y Obras Públicas, resolvería que actuó correctamente al no inscribir un vehículo que no cuenta con la certificación del pago de arbitrios que emite el Secretario de Hacienda, pues las leyes del Departamento de Transportación y Obras Públicas, anteriormente discutidas, categóricamente se lo prohíben.

No siendo éste el criterio mayoritario, me veo compelida a disentir.

Liana Fiol Matta
Jueza Asociada

---

Hacienda constituyen una deficiencia contributiva" y sostuvo su alegación con referencias a la sección 2014(c)(2) del Código de Rentas Internas, la cual dispone que la determinación del Secretario de Hacienda no menoscabará las disposiciones sobre el cobro de deficiencias. Petición de *certiorari*, págs. 29 y 35.